[No. E010040. Fourth Dist., Div. Two. Oct. 1, 1992.]

In re EMILYE A., a Person Coming Under the Juvenile Court Law.
SAN BERNARDINO COUNTY DEPARTMENT OF PUBLIC SOCIAL
SERVICES, Plaintiff and Respondent, v.
EBRAHIM A., Defendant and Appellant.

[No. E010423. Fourth Dist., Div. Two. Oct. 1, 1992.]

In re EMILYE A., a Minor, on Habeas Corpus.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976(b) and 976.1, this opinion is certified for publication with the exception of parts 1, 2 and 4 of the Discussion.

## COUNSEL

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant and for Petitioner.

Alan K. Marks, County Counsel, Patricia Campbell and Andrew L. Kjeld-gaard, Deputy County Counsel, for Plaintiff and Respondent.

William Bud Walls II, under appointment by the Court of Appeal, for Minor.

## OPINION

TIMLIN, J.—

### INTRODUCTION

Ebrahim A. (father) appeals from a disposition order declaring Emilye A. (minor) a dependent child in a Welfare and Institutions Code section 300 proceeding.[1] More specifically, he appeals from the juvenile court order finding minor is a person described under section 300, subdivisions (b) and (d), based on the allegation that father molested minor, and that mother, without an order from the juvenile court restricting father's visitation, would be unable to protect minor. Father contends that (1) the admission of certain evidence at the jurisdiction hearing deprived him of his constitutional right to confrontation, (2) there was insufficient evidence to support a finding that he molested minor, and (3) he was deprived of the effective assistance of his first attorney at the jurisdiction hearing.

---

[1]All further statutory references will be to the Welfare and Institutions Code unless otherwise noted.

Father has also petitioned us for a writ of habeas corpus, contending that his second attorney, by failing to move for a new trial as to the issues resolved at the jurisdiction hearing, deprived father of the effective assistance of counsel.

FACTS

The San Bernardino County Department of Public Social Services (DPSS) filed a petition under section 300, subdivisions (b) and (d) on February 20, 1991, alleging minor had been sexually abused by her father on or about February 2, 1991. A detention hearing was held on February 21, 1991. At this hearing, counsel was appointed for mother, father, and minor.[2] Minor was detained and placed in temporary custody of her mother, with no visitation by father pending a further hearing. The matter was continued for a contested detention hearing. A contested detention hearing was held on February 26, 1991, and minor was ordered to be further detained in the custody of her mother. The matter was continued to March 14 and 15 for a contested hearing on jurisdiction.

The following evidence was presented at the contested jurisdiction hearing. Minor was adopted by father and mother as an infant in 1988. Mother and father had been married for four years before the adoption. In February 1990, about two years after minor was adopted, mother and father separated and were in the process of dissolving their marriage. Mother, at the time in question, had physical custody of the minor and father had visitation rights on alternate weekends. The parents were still trying to work out an extra day of visitation during the week for father.

On Monday evening, February 4, 1991, minor, who was then two years and eleven months old, after a weekend with her father, was playing with mother, chasing and tumbling. In the midst of this play, minor said "Ouch, mommy. You hurt my owie." According to mother, "Usually when she says that, it is it, she's hurt or she has got something. And what I usually do then I either put a band-aid. I kiss it to make the owie better. When I said where is your owie. And she says—she touched her crotch. And she says right here. And I said you have an owie there. And she says uh-huh. And I says show me. She laid down on the couch, pulled her panty—pants, and her panties down. She took both hands. And she opened herself up. And she says right here. And pointing to the clitoris area. And she says daddy gave my owie. He did this. And she did a finger motion, a rubbing motion like this, that.

"Q Did she use one finger?

---

[2]There is some indication that father retained his trial attorney who is noted as having been appointed at the detention hearing.

"A She used one finger, index finger.

"Q And she said daddy did that?

"A She says daddy did that.

"Q Did she tell you anything else?

"A I asked, I said, my comment was daddy did that? And she said yeah, mommy, like this. Then I examined to see if there was anything out of, swollen or anything like that. And nothing.[3] And she says twice. You know, she said two times. And she held up two fingers.

"Q Did you understand that to be two separate times?

"A I assumed that. I don't know."

Mother testified that she then called father by telephone and asked him if he had touched minor somewhere he was not supposed to touch her. According to mother, father responded by calling her names and hanging up on her.

After minor disclosed the molestation, mother told her live-in housekeeper/babysitter what minor had said, and the housekeeper mentioned that minor had told the housekeeper about the "owie" on Monday morning while being dressed. Mother was upset that the housekeeper had not realized the possible import of the statement, and fired the housekeeper.

Mother testified that on one other occasion, about four or five months before the February 4 disclosure by minor, minor was playing with her genital area, or "pane," in the bathtub. Mother told minor, "casually," don't play with your "pane." Minor looked up and said "like daddy." "So, I just to find out some more information, very casually I said does—my sister had, Vela had visited sometime before that. And I said—and her daughter, 19-year-old daughter Minnie was with her. And Minnie had played a lot with [minor]. And I said does Minnie play with your pane? She says uh-huh. Does Enadina [sic] play with your pane? She says uh-huh. Does mamma play with your pane? She says uh-huh. So, I thought it was nothing. I let it go."

After calling father on February 4, 1991, mother then called several people—her sister, Enedina; two women (Maxine G. and Patricia M.) whose

---

[3]On cross-examination, mother said that minor's clitoris was enlarged.

statuses as friend, relative or other were not identified; Sister Mary Veronica R.; a pediatrician who was taking her pediatrician's calls that night; and her lawyer in the family law matter. The on-call pediatrician told her to bring minor in the next morning to see her regular pediatrician.

Mother took minor to her regular pediatrician the next day. Mother was present during the minor's examination, which, according to her, did not show anything physical which was attributable to molestation.

According to mother, as brought out on cross-examination by father's attorney, the pediatrician did not ask minor about the alleged molestation, but gave her a physical examination designed for three-year-old children, which included an examination of her genital area. He did not ask her about her "owie," but asked whether some play blocks which had fallen on her leg during the examination had given her an "owie," to which she replied "no." Mother called child protective services (CPS), apparently on February 5 after visiting the pediatrician, and CPS called the San Bernardino Police Department. On February 11, 1991, the San Bernardino Police Department prepared a "juvenile application for petition and juvenile investigation report" related to the February 2, 1991, incident. A second application was prepared on February 19, 1991.

Minor was first interviewed by B. J. D'Escalis, a CPS emergency-response worker and social worker, on February 11. Ms. D'Escalis had received a referral of a possible sexual molestation from other CPS staff members. She interviewed minor alone, and began by playing with minor for a while. She then asked minor if she had an "owie," to which minor replied "yes," and demonstrated by spreading her legs and pointing to her vaginal area, while rubbing her thumb and first two fingers together. She said daddy gave her the "owie." D'Escalis asked her if she had her panties on or off, and she replied that they were off. D'Escalis asked her how many times, and minor held up two fingers. She asked minor if she asked daddy to stop, and minor said she told daddy it hurt. D'Escalis asked where the molestations occurred but received no clear response. She also testified she wasn't sure if minor told her whether the incident or incidents occurred at daddy's house or not. D'Escalis stated that minor appeared to be fairly verbal. She tried to ascertain if minor understood the difference between telling the truth and a lie, but because minor was more interested in playing, she was not able to assure herself one way or the other. She did not speak with minor's pediatrician.

After the interview by Ms. D'Escalis, Plainclothes Officer Jeff Prostler attempted to interview minor but the minor said "I will not tell the man about my owie."

Father's girlfriend testified that she spent the weekend in question, among others, with father and minor, and that she did not observe any sexual molestation of the minor by father on any of those occasions. She said that in her opinion father was not the type of person to molest children. On cross-examination, it was apparent that father's girlfriend had not spent every moment with father and minor on the subject weekend, so that father would have had the opportunity to molest minor without being seen by father's girlfriend.

Father testified as follows. He did not sexually molest minor, and he described his loving and care-giving relationship with her, including the fact that he bathed her and wiped her after she had used the toilet. The dissolution and custody proceedings between him and his wife were rancorous, and he believed his wife was trying to deny him custody or visitation with the minor because the family law judge had not ordered him to pay the amount of spousal support and child support she had requested. Father also questioned why he would molest his daughter within less than a month of the date set for family mediation, suggesting that the timing did not make sense. He also indicated minor could count to 10.

The social study, which was admitted into evidence, was prepared by Ms. D'Escalis. It included, as an attachment, a social worker's report dated February 20, 1991. The attached sheet stated: "The minor's mother took the minor to be seen by a pediatrician on February 5, 1991. The pediatrician could find no physical evidence, but felt that the minor's description of what had occurred was credible because of the detail which could not otherwise be known by a child so young."[4]

Father's motion to dismiss based on insufficient evidence was denied.

The juvenile court commented that if the proceeding was a criminal trial, there might not be enough evidence to find father had sexually molested

---

[4]It is not clear who prepared the attachment, or whether the preparer spoke directly to the doctor. It seems possible, given the statutory reporting requirements, that the pediatrician called CPS to report that his patient was possibly the victim of sexual molestation. (The police report states that the doctor contacted CPS to initiate an investigation.) Given mother's testimony that the pediatrician did not question minor, his detailed comments would have to have been based on mother's recounting to him minor's statements and her demonstration to mother.

Alternatively, mother may have told the preparer that that is what the pediatrician told her, or a police officer may have told a social worker that mother told the police officer that that is what the doctor told mother. (In the social study, the social worker states that "Officer Turner advises that . . . he interviewed . . . mother. . . . 'Dr. Somchart Chaiyan [the pediatrician] told ([mother]) that there was no obvious physical trauma, however, the victim's demonstrations of the molest are too graphic to be made up by a child at the age of two years.' ")

minor. However, based on mother's and Ms. D'Escalis' testimony, in contrast with father's and his girlfriend's testimony, it found that there was clear and convincing evidence to support a finding that minor came within the provisions of section 300, subdivisions (b) and (d). Father was given supervised visitation with minor of two hours per week pending the disposition hearing, and the minor was ordered to remain in the custody of mother.

On April 9, 1991, father's trial attorney was relieved as counsel, and another attorney was appointed to represent father. The disposition hearing, set for that date, was continued several times at father's attorney's request and eventually conducted on August 22. On June 11 father's attorney stated his intent to move for a new trial as to the issues determined at the jurisdiction proceeding. The juvenile court ordered him to file his motion for a new trial by July 12.

On August 22, father's attorney filed a "notice of continuance of motion for new trial and disposition hearing." The notice was unaccompanied by any motion, declarations, or points and authorities. At the hearing, father's counsel stated that he had advised father that after reviewing the transcript of the jurisdiction hearing, and doing some research, it was his opinion that there was no legal basis to question the order finding jurisdiction. He also stated that he agreed with father that some of the tactical decisions made (apparently by father's original attorney at the jurisdiction hearing) did not "assist [father] in the adequate presentation of the case," and that father felt very strongly that the pediatrician should have been called as a witness regarding the absence of physical evidence of sexual molestation.

Counsel then stated that he had explained to father that if father felt he had not completely presented father's position to the court, father might wish to make a statement to the court, and in conclusion, he (counsel) wished to move on to the disposition portion of the hearing. Addressing the question of the proper disposition, counsel reiterated father's assertions of innocence as to the molestation and stated that the dynamics of the marital dissolution were causing problems for the child. He requested that, in creating a plan to restore the relationship between father and minor, the first step be the appointment of a psychologist to evaluate both parents, and that the psychologist be paid by the court with future reimbursement by the parents. The court then allowed father to make a statement. Father expressed his belief that his first attorney had not properly represented him, specifically by not showing there was "no doctor evidence that says such things happened."

The motion to continue the hearing was denied. The disposition hearing was concluded and the court declared the minor to be a dependent child. It

ordered minor placed in mother's custody, with monitored visitation by father. No psychological examination was ordered, but both parents were ordered to participate in DPSS's stabilization/termination plan. The matter was then continued to February 20, 1992, for the semiannual review. Father filed a timely notice of appeal from the disposition order.

DISCUSSION

1., 2.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

3. *Father Was Entitled to Effective Assistance of Counsel, Whether Appointed or Retained, During the Dependency Proceeding. However, He Has Failed to Show That His Trial Attorney's Actions or Inactions Prejudiced Him, i.e., That There Is a Reasonable Probability That in the Absence of Any Ineffective Assistance, the Juvenile Court Would Have Reached a Different Result*

Father contends that he was entitled to effective assistance of counsel during the section 300 proceedings, including the jurisdiction hearing, that he did not receive such assistance, and that therefore the juvenile court's finding that minor was a dependent child must be reversed. DPSS contends that there is no right to effective assistance of counsel in juvenile dependency proceedings, "especially not in Welfare and Institutions Code section 300 jurisdictional proceedings where no determination regarding the termination of parental status is made." More specifically, DPSS contends, given that minor was placed with mother, and father was given visitation, that "termination of parental rights cannot be reasonably contemplated . . . under Welfare & Institutions Code section 366.26."

In *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18 [68 L.Ed.2d 640, 101 S.Ct. 2153], which addressed the question whether an indigent mother had a constitutional due process right to appointed counsel in parental termination proceedings, it was recognized that under certain circumstances, an indigent parent has a constitutional due process right to counsel in proceedings to terminate the parent's relationship with his or her child. Under *Lassiter*, in order to establish that she/he was deprived of this due process constitutional right to representation by counsel, a parent must demonstrate on appeal that the absence of counsel made a "determinative difference" and "render[ed] the proceedings fundamentally unfair." (*Lassiter* v. *Department of Social Services, supra*, 452 U.S. at p. 33 [68 L.Ed.2d at p. 653, 101 S.Ct. 2162].)

*See footnote, *ante*, page 1695.

Here, the parties do not dispute father's *statutory* right to appointed counsel in dependency proceedings upon his showing of indigence, which appointment by the juvenile court is discretionary under certain circumstances and mandatory under others. (See § 317, subd. (b) and Cal. Rules of Court, rule 1412(h).) But they do acknowledge there is currently a split of authority whether a parent in a dependency proceeding is *constitutionally* entitled to *effective* representation of counsel.

In *In re Christina H.* (1986) 182 Cal.App.3d 47, 49 [227 Cal.Rptr. 41], the second district held that a parent is entitled to effective assistance of retained, as well as appointed, counsel in a dependency proceeding, and reversed the order sustaining a section 300 petition because the parent was denied effective assistance of retained counsel. The court concluded that where the right to counsel was based on due process requirements, which are implicated whenever the parents are unable to present the case themselves and because of the substantial likelihood that the parents may lose custody of the minor, there is also a due process constitutional right to *effective* assistance of counsel. In so concluding, the court relied on *Cleaver* v. *Wilcox* (9th Cir. 1974) 499 F.2d 940, 945, which held that parents have a correlative due process constitutional right to effective assistance of counsel, whether retained or appointed, whenever they face a substantial possibility " 'of the loss of custody or of prolonged separation from a child.' " (182 Cal.App.3d at pp. 49-50.)

The *In re Christina H.* court pointed out, based on the holding in *Cleaver* v. *Wilcox*, that California Rules of Court, rules 1334(c) and 1363(c)[8] had been enacted and they provide that under certain circumstances indigent parents shall be appointed counsel in dependency proceedings. (182 Cal.App.3d at p. 49.) Noting that indigence by itself does not operate to increase a person's constitutional rights, and that even parents who can afford to choose an attorney do not choose to hire an incompetent one, the court concluded that the constitutional right to effective assistance of counsel in certain cases extends to retained as well as appointed counsel.

In *In re Ammanda G.* (1986) 186 Cal.App.3d 1075 [231 Cal.Rptr. 372], the third district held that because section 300 proceedings do not terminate parental status, they do not give rise to an indigent parent having a constitutional right to appointed counsel on due process grounds (at pp. 1079-1080), and that even if such right existed, the denial of effective counsel is not cognizable on appeal because dependency proceedings are civil in nature. However, we find the analysis in *In re Ammanda G.* unpersuasive, given the self-evident fact that a parent's constitutionally protected interest

---

[8]Rules 1334 and 1363 were repealed as of July 1, 1989. But see rule 1412(g) and (h) which was adopted effective January 1, 1991.

in parenting involves more than retaining the mere status or title of parent, a fact implied by *Cleaver* v. *Wilcox, supra*, 499 F.2d 940 which, to repeat, held that due process is implicated whenever there is "a substantial possibility of the loss of custody or of prolonged separation from a child." (*Id.* at p. 945, fn. omitted.)

Practically speaking, once the state has become involved in the parent/ child relationship through a section 300 dependency proceeding, there is a substantial possibility that the parent may lose custody of the child or be separated from the child for significant periods of time. Like termination proceedings, dependency proceedings may work a unique kind of deprivation. Indeed, they are frequently the first step on the road to permanent severance of parental ties. (§§ 366.21, 366.22 and 366.26; *In re Malinda S.* (1990) 51 Cal.3d 368, 383-384 [272 Cal.Rptr. 787, 795-796, 795 P.2d 1244].) A parent who is unable to present an adequate defense from the outset may be seriously disadvantaged later. As the Supreme Court observed in *Lassiter*: "Informed opinion has clearly come to hold that an indigent parent is entitled to the assistance of appointed counsel not only in parental termination proceedings, but also in *dependency* and neglect proceedings as well. [Citations.]" (*Lassiter* v. *Department of Social Services, supra*, 452 U.S. at pp. 33-34 [68 L.Ed.2d at p. 654, 101 S.Ct. at p. 2163], italics added.)

█ We agree with those authorities that hold that a parent has not only a statutory right but also, under certain circumstances, a constitutional right to counsel in dependency proceedings, particularly, as in this case, where the petition contained an allegation of sexual abuse by father, which could result in criminal charges against him. (See *Lassiter* v. *Department of Social Services, supra*, 452 U.S. at p. 27, fn. 3 [68 L.Ed.2d at p. 650, fn. 3, 101 S.Ct. at p. 2160, fn. 3].) We further agree with *In re Christina H.*'s holding that where a parent has established a constitutional right to counsel, whether appointed or retained, in a dependency proceeding, she or he is entitled to effective assistance of counsel. (See also *In re Arturo A.*, (1992) 8 Cal.App.4th 229, 238 [10 Cal.Rptr.2d 131].)[9]

Here, then, the question is whether father has established that he had a due process right to appointed counsel, and hence to effective assistance of that

[9]Some courts, while recognizing that a right to effective counsel may exist, have held or stated in dicta that a parent may not seek reversal of an order in a dependency proceeding on the grounds of incompetency of counsel, using the rationale that the paramount concern is the child's welfare. (See, e.g., *In re Mary S.* (1986) 186 Cal.App.3d 414, 418-419, 418 fn. 3 [230 Cal.Rptr. 726].) However, the implicit and erroneous assumption on which this reasoning is based is that the child's welfare *has* been served by the interruption of the parents' custody and control despite the fact that the child's parents were not effectively represented during the proceedings. Can it be said that it is in the best interest of a child to be taken from the

counsel. According to *Lassiter*, to determine whether there is a due process right to appointed counsel, three elements—the private interests at stake, the government's interest, and the risk that the procedures used will lead to erroneous decisions—must be balanced against each other, and then their net weight must be weighed against the presumption that there is no right to appointed counsel unless the indigent party, if unsuccessful, may lose his or her personal freedom. The net weight of such factors when so weighed must be sufficient to rebut that presumption and lead to the conclusion that due process requires the appointment of counsel when the state seeks to terminate an indigent's parental status. (452 U.S. at pp. 27, 31 [68 L.Ed.2d at pp. 649, 652, 101 S.Ct. at pp. 2159, 2161-2162].)

*Lassiter* also held that the decision of whether such a right exists in a particular case should be answered in the first instance by the trial court (452 U.S. at p. 32 [68 L.Ed.2d at p. 652, 101 S.Ct. at p. 2162]), but, like the court in *Lassiter*, we ourselves will make that decision now in the interest of rapidly concluding this case which involves the minor's custody and supervision. (*Ibid.*)

We now engage in the required weighing process.

## A. *Father's Private Interest*

It is well settled that a parent's interest in maintaining a normal parent/child relationship is an extremely important interest. (452 U.S. at p. 27 [68 L.Ed.2d at pp. 649-650, 101 S.Ct. at pp. 2159-2160.) Although *Lassiter* involved a termination of the parent/child relationship, a dependency proceeding which seriously infringes on the parent's ability to parent a child for a substantial period of time, and which may form the basis for subsequent termination of the relationship, as noted above, similarly seriously implicates that same important interest. To quote *Lassiter*: "This court's decisions have by now made plain beyond the need for multiple citation that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' [Citation.]"

The parent has an additional important personal interest to protect when the petition to terminate his or her relationship with the child, or to remove

accustomed custody and control of his or her parents when there has not been a fair hearing related to the need for such intervention?

These cases also ignore the fact that reversal of an order in a dependency proceeding does not necessarily mean that the status quo is reinstated and that the child can no longer be protected. A reversal because of ineffective assistance of counsel does not preclude further dependency proceedings in juvenile court; it simply requires that the proceedings be reconducted because the parents were not properly represented.

the child from the parent's custody, is based on alleged criminal activity. (452 U.S. at p. 27, fn. 3 [68 L.Ed.2d at p. 650, fn. 3, 101 S.Ct. at p. 2160, fn. 3.)

B. *State's Interest*

As noted in *Lassiter*, the state's interest in the child's welfare is also important, but may also best be served by making sure that the parent is adequately represented at hearings involving that welfare. (452 U.S. at pp. 27-28 [68 L.Ed.2d at p. 650, 101 S.Ct. at p. 2160; see also fn. 9, *ante*.) Even when one considers the state's interest in informal procedures and in avoiding the expense and possible increase in time involved when counsel is appointed, such interests, although legitimate, are not significant enough to overcome the importance of the parent's private interests. (452 U.S. at pp. 28, 31 [68 L.Ed.2d at pp. 650, 652, 101 S.Ct. at pp. 2160, 2162].) Here, of course, because the parties agree that father had a statutory right to appointed counsel, this pecuniary interest does not outweigh the other two interests at stake.

C. *Risk That Procedures Will Lead to Erroneous Decision*

The risk that an erroneous decision may be made in the absence of legal representation for the parent, a risk which *Lassiter* pointed out in connection with termination proceedings, applies equally in dependency proceedings which involve evidentiary issues, particularly expert medical and psychiatric testimony. Few lay people are equipped to respond to the legal complexity of such proceedings, particularly when, in addition to attempting to refute the case made against them and to present their own case, they are dealing with the emotionally devastating potential loss of all of, or significant aspects of, their relationship with their children, not to mention potential findings that they have committed criminal and/or morally condemned acts.

The potential pitfalls faced by an unrepresented parent may be further compounded by the fact that once a petition has been filed, the county usually is represented by its own attorney, who is educated in the law and experienced in representing the county at dependency hearings. Recognizing that the parents and county are both interested in an accurate and just decision in the child's best interests, the dependency proceedings are adversarial in nature, which process presumably contributes to a just decision. However, the county is advocating a position which, if successful, may result in depriving a parent of his or her constitutional right to parent.

If the parent is unrepresented and the county has legal counsel, the contest between the two sides, in many cases, would be so tilted in favor of the

county's position that the purpose of the adversarial proceeding, i.e., an accurate and just decision, would not be obtainable. As observed by *Lassiter*, the state's interest in the child's welfare may best be served by appointing counsel for the parent: "Since the State has an urgent interest in the welfare of the child, it shares the parent's interest in an accurate and just decision. For this reason, the State may share the indigent parent's interest in the availability of appointed counsel. If, as our adversary system presupposes, accurate and just results are most likely to be obtained through the equal contest of opposed interests, the State's interest in the child's welfare may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal." (452 U.S. at pp. 27-28 [68 L.Ed.2d at p. 650, 101 S.Ct. at p. 2160].)

Under the circumstances of this case, we are convinced that if father had been unrepresented by counsel, there was a high risk of an erroneous and unjust decision at the jurisdiction hearing, which decision would be contrary to the best interests of the minor and the father's constitutional right to parent. These circumstances include: (1) English was not the father's native language. As is apparent from the record, his language had a distinctly foreign context. He could have had difficulty in questioning witnesses and presenting his position to the court. (2) Father was confronted with the possible adverse testimony of: (a) a pediatrician concerning a physical examination he conducted on the minor, (b) his very young child, (c) professional social workers, (d) law enforcement officers, and (e) the child's mother with whom he was engaged in a bitter marital dissolution proceeding. The testimony and potential testimony of these adverse witnesses implicated the hearsay rule and exceptions thereto, as well as competency issues. (3) The conduct alleged against him involved a potential serious criminal charge, thus implicating evidentiary privileges available to him.

Without the assistance of counsel, a parent faced with these circumstances would have been very disadvantaged: (1) there would be potential emotional problems presented for one faced with personally questioning his child and wife about such a serious allegation; (2) without knowledge of the rules of evidence and being opposed by county's counsel, an unequal presentation of evidence was likely; and (3) there was the risk of father's self-incrimination as to a future felony child molestation charge, if he decided to testify. Facing these potential problems and being "thrust into a distressing and disorienting situation" (*Lassiter, supra*, 452 U.S. at p. 30 [68 L.Ed.2d at p. 651, 101 S. Ct. at p. 2161]) as an uncounseled parent, he would have been less likely to be able to assist the court in reaching a correct and well-informed decision.

In our view, as to this particular case, the above discussed three elements of due process in balance outweigh any presumption that father had no right

to counsel in a dependency proceeding. Fundamental fairness required the appointment of counsel for father. In other words, given the importance of (1) father's continuing and intense interests in maintaining an unrestricted relationship with minor (unlike the mother in *Lassiter*) and in avoiding a finding that he had engaged in criminal acts, (2) the state's interest in making sure the child's welfare is protected by a correct decision, and (3) the potential for an erroneous decision if father was not represented by counsel, we conclude that father, as an indigent, had a due process right to appointed counsel in this proceeding.

Having decided that father had a due process right to appointed counsel, we now consider whether father received effective representation by trial counsel and, if not, whether he was prejudiced thereby.[10]

Where the ineffective assistance concept is applied in dependency proceedings the appellant must meet the standards set forth in *People* v. *Pope* (1979) 23 Cal.3d 412 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1] and *Strickland* v. *Washington* (1984) 466 U.S. 668 [80 L.Ed.2d 674, 104 S.Ct. 2052]. (*In re Dawn L.* (1988) 201 Cal.App.3d 35, 37 [246 Cal.Rptr. 766].) First, there must be a showing that "counsel's representation fell below an objective standard of reasonableness . . . . [¶] . . . under prevailing professional norms." (*Strickland, supra,* 466 U.S. at p. 688 [80 L.Ed.2d at p. 693-694, 104 S.Ct. at p. 2065]; accord, *Pope, supra,* 23 Cal.3d at pp. 423-425.) Second, there must be a showing of prejudice, that is, "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland, supra,* 466 U.S. at p. 694 [80 L.Ed.2d at p. 698, 104 S.Ct. at p. 2068].)

Here, father contends that his first attorney failed to provide effective assistance of counsel in three respects: (1) by failing to cause minor's presence at the jurisdiction hearing for a determination of her competency to testify; (2) by failing to properly authenticate the medical chart prepared by minor's pediatrician so as to have it admitted into evidence; and (3) by failing to subpoena minor's pediatrician to testify at the jurisdiction hearing. We now apply the above stated two-prong test of *Pope/Strickland* to each of these alleged failures to perform as competent counsel.

---

[10]At this point we feel compelled to comment that a meritorious argument could be made that an indigent parent has a due process right under the California Constitution to appointed counsel in dependency proceedings and a concomitant right to effective assistance of counsel. Based on our analysis here, we do not reach that question in this case.

### a. *The Failure to Cause Minor's Presence at the Jurisdiction Hearing for a Determination of Her Competency as a Witness*

 As noted by father, during the jurisdiction hearing his attorney objected strenuously, but without success, to the admission into evidence of the social study as hearsay, and particularly the recitation therein of statements by minor to her mother and Ms. D'Escalis. He argued that the court was choosing, over his objections, to admit minor's statements even though she had never been found competent to be a witness, and that the court was not allowing him to examine minor, but was instead bringing in minor's statements through "these other" witnesses (presumably mother and Ms. D'Escalis). He concluded by stating that the whole thrust of his objection to the admission of minor's statements was that minor "can't" qualify to testify in a court, and that she wasn't a competent witness "whether it be the courtroom statement or a hearsay statement."

It appears that father's attorney was under the mistaken belief that he was being precluded by the court from calling minor for the purpose of establishing her to be nonqualified as a witness due to incompetency, presumably under Evidence Code section 701 (the record does not reflect any such ruling or action by the court, let alone any attempt by father's attorney to call minor as a witness). He also had an equally mistaken belief that minor's legal competency to testify as a witness at the hearing had some bearing on the admissibility of her nontestimonial, out-of-court statements to mother and Ms. D'Escalis. We, however, need not address whether father's attorney's representation fell below the prevailing professional norms due to these mistakes because we conclude that father has not met the second step of the *Pope/Strickland* test. He has failed to make a showing of prejudice resulting from such mistakes. Assuming for the sake of argument that minor had been called and found incompetent to testify as a witness, her statements made to her mother that her father had given her an "owie" and her enactment of where and how the "owie" was given were properly admitted through the testimony of her mother at the jurisdiction hearing.[11]

 Statements of a witness who is not competent to testify as a witness at trial may nonetheless be admissible if they are otherwise reliable under "firmly rooted" exceptions to the hearsay rule. For example, in *In re Damon*

---

[11]Mother's testimony regarding her daughter's statements was objected to by father's counsel as hearsay but the objection was overruled by the juvenile court. Father has not assigned this ruling by the court as an error on appeal and we do not consider it. Our discussion of the admissibility of the minor's statements to her mother and the applicable hearsay exceptions is limited to showing that such statements to mother, which were also admitted into evidence as part of the social worker's report, were admissible irrespective of the minor's qualification to testify as a witness.

*H.* (1985) 165 Cal.App.3d 471 [211 Cal.Rptr. 623], the victim, a child, aged two years and nine months, was found incompetent to testify at trial. Nonetheless, his statement to his mother that he had been sodomized was admissible under the spontaneous statement hearsay exception. (See also *People* v. *Orduno* (1978) 80 Cal.App.3d 738 [145 Cal.Rptr. 806] to the same effect.) This exception as provided in Evidence Code section 1240 is a firmly rooted hearsay exception surrounded by indicia of reliability. (*People* v. *Trimble* (1992) 5 Cal.App.4th 1225, 1235 [7 Cal.Rptr.2d 450]. See also *White* v. *Illinois* (1992) 502 U.S. __, fn. 8 [116 L.Ed.2d 848, 859-860, fn. 8, 112 S. Ct. 736, 742-743, fn. 8].)

Here, minor's statements to her mother would have been admitted under the spontaneous statement exception. Although minor's remarks were not made until a day or two after she received her "owie," the circumstances under which they were made are sufficient to qualify them as spontaneous declarations. "Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance. [Citations.]" (*People* v. *Washington* (1969) 71 Cal.2d 1170, 1176-1177 [81 Cal.Rptr. 5, 459 P.2d 259, 39 A.L.R.3d 541].) Minor's comments were made in the midst of play with mother, apparently when, while playing with minor, the irritated area was accidentally touched and minor reexperienced the pain of the "owie." These circumstances, i.e., that the statements were made spontaneously, while in the midst of play, that they were made by a child sufficiently young that her reflective powers would be relatively unsophisticated, and that they were made while the minor was in pain (see *In re Damon H., supra,* 165 Cal.App.3d at p. 476) all indicate that they were made under stress or excitement, while the declarant's reflective powers were still in abeyance. (*People* v. *Farmer* (1989) 47 Cal.3d 888, 903 [254 Cal.Rptr. 508, 765 P.2d 940].)

Furthermore, minor's statements to her mother were also admissible under the physical sensation exception to the hearsay rule. Exclamations made by an injured person to either a medical or lay witness of present pain or suffering are not inadmissible as hearsay. (*Capelouto* v. *Kaiser Foundation Hospitals* (1972) 7 Cal.3d 889, 895 [103 Cal.Rptr. 856, 500 P.2d 880].) For example, in *People* v. *Mendibles* (1988) 199 Cal.App.3d 1277 [245 Cal.Rptr. 553], in the prosecution of the victim's common law stepfather for forcible lewd conduct with a child, the victim's hearsay statement that she was bleeding and had bled before because defendant had touched her were properly admitted as a statement of the victim's present physical condition and her view of its cause. (*Id.* at p. 1304; see also *White* v. *Illinois, supra,* 502 U.S. __ [116 L.Ed.2d 848, 859-860, fn. 8, 112 S.Ct. 736, 742-743, fn. 8].)

 Therefore, father's attorney's failure to call minor for the purpose of testing her competency as a witness did not prejudice father because, regardless of whether minor was found competent or not, her statements to her mother were admissible.[12]

Regarding the admission into evidence, through Ms. D'Escalis's testimony and through the social study, of minor's statements to Ms. D'Escalis, even if we assume *arguendo* that there was no applicable hearsay exception to such testimony, and the admission of such statements through the social study was erroneous, a substantial portion of those statements was admitted through Ms. D'Escalis's testimony at the hearing before father made any evidentiary objection to such.[13]

On direct examination she testified:

"Q And what did you say to the minor?

"A We played for a while. I asked her if she had an owie. She said yes. I can't remember the exact words. I am sorry.

"Q Okay. Did the minor show you where her owie was?

"A Yes, she did.

"Q Where was that?

"A She sat down and spread her legs and pointed at her vaginal area.

"Q Did she do anything else when she was pointing to her vaginal area[?].

[12]The applicability of the spontaneous exclamation and physical sensation exceptions to the hearsay rule regarding the minor's statements to her mother obviate the necessity of our addressing father's contention that the juvenile court's admission of minor's statements to her mother by admitting the social worker's report, under the social study exception in section 281, was error because the report did not have sufficient indicia of reliability and section 281 is not a "firmly rooted" hearsay exception. We do note that the discussion in *In re Malinda S.*, *supra*, 51 Cal.3d at pages 381-382 appears to reject such contention: "Neither that court nor the dissent herein has cited any case suggesting that a hearsay exception is somehow less worthy because it is specific to a certain type of case, 'nontraditional,' or contained outside the Evidence Code. Indeed, even those exceptions contained in the Evidence Code are often quite 'specialized.' (See Evid. Code, § 1226 [hearsay exception for statement of minor child in parent's action for child's injury]; *id.*, § 1227 [hearsay exception for statement of declarant in action for his wrongful death].) Because social studies are made admissible by section 281, we conclude they meet the standard of proof required by section 355, and constitute competent evidence." (Fn. omitted.)

[13]It should be noted that at the outset of the hearing, father only objected to the admissibility of such statements as contained in the social study; not to the prospective testimony of mother or Ms. D'Escalis regarding the minor's statements.

"A Yes. She made a hand motion like (demonstrating).

"[MINOR'S COUNSEL]: Your Honor. The record should reflect the witness is rubbing her hands—fingers together.

"THE COURT: Appears to be her thumb and her first two fingers.

"Q Did she say how she got that owie?

"A She said Daddy gave her the owie.

"Q Did she say how she got—did she say anything further about how Daddy gave her the owie?

"[DEFENSE COUNSEL]: I would object to this hearsay statement.

"THE COURT: Overruled. You may answer."

Father has not assigned as an error on appeal the court's overruling the hearsay objection to Ms. D'Escalis's above quoted testimony and we do not address it. Consequently, this testimony, together with the properly admitted statements of minor to her mother and other evidence, persuade us that even if father's trial counsel's representation was ineffective by failing to call minor to testify for the purpose of determining her qualification as a witness, there is no reasonable probability that the jurisdiction order would have been different.

### b. *The Failure to Have Minor's Medical Chart Admitted Into Evidence and the Failure to Subpoena Minor's Pediatrician to Testify as a Witness*

As documented by father's attorney on appeal, father's trial counsel made several unsuccessful attempts at the jurisdiction hearing to have admitted into evidence a copy of the examining pediatrician's chart notes.[14] ██ Father contends that his attorney's failure to have this document admitted into evidence (by calling the pediatrician as a witness to lay a suitable foundation for its admission) was ineffective representation by counsel, which prejudiced him. He states in his opening brief that "[t]he only information about the lack of physical findings of molestation on [minor] appeared in the social studies and attached police report submitted to the

---

[14]The chart notes of the examination indicate no abnormalities in the genital area, and state "Possible Sexual abuse (From history only)." They also indicate that the pediatrician tried to talk to minor about the incident, but that she was not very communicative.

court.[15] However, the lack of physical findings is qualified by the doctor's alleged statement that the minor's description was 'credible because of the detail which could not otherwise be know[n] by a child so young.' . . . The inherent unreliability of that statement, admitted into evidence through the social reports pursuant to section 281 and 355, is that the source of the information to which the doctor replied was [minor's] mother!" According to father, if the pediatrician had been called, his testimony would have shed some light on what had occurred at minor's physical examination, the doctor's findings or lack of findings, the child's reactions, mother's statements and demeanor, and whether the pediatrician actually made the statement attributed to him.

It is apparent from the above quotation that father's real concern is not so much that the medical chart was not admitted into evidence as that the pediatrician was not called to be questioned about the circumstances surrounding the physical examination of minor.[16] However, father has failed to meet the first prong of the *Pope/Strickland* standard. ■ "In some cases . . . the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal. [Citation.]" (*Pope, supra,* 23 Cal.3d at p. 426, fn. omitted.)

■ Here, the record does not show that father's attorney's failure to subpoena the pediatrician to testify was not a tactical decision. We believe there is a satisfactory explanation for such failure. Father's attorney could reasonably have concluded that the pediatrician's testimony as to the examination would have been cumulative to the testimony by the mother regarding the examination and the social study's recitation of the doctor's chart notes, but if the doctor did testify, he might reaffirm and elaborate on his comment in the notes that a two-year-old child could not create such a detailed story on her own.

We decide that father's trial counsel's failure to authenticate the pediatrician's chart notes and to subpoena the pediatrician to testify for the purpose noted did not breach the objective standard of reasonableness under prevailing professional norms.

---

[15]This statement is incorrect. Mother also testified that the pediatrician found no physical evidence of molestation.

[16]The contents of the medical chart were part of the social worker's report which was admitted into evidence.

4. *Father Has Failed to Establish, in His Petition for a Writ of Habeas Corpus, That His Second Attorney Did Not Effectively Represent Him\**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The order finding minor to be a dependent child is affirmed. The petition for a writ of habeas corpus is denied.

Ramirez, P. J., and McDaniel, J.,† concurred.

---

\*See footnote, *ante*, page 1695.

†Retired Associate Justice of the Court of Appeal, Fourth District, senior status (Gov. Code, § 75028-1), sitting under assignment by the Chairperson of the Judicial Council.