Filed 10/25/23  In re E.D. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re E.D. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.D., <br><br> Defendant and Appellant. | G062365 <br><br> (Super. Ct. Nos. 22DP0774, 22DP0775, 22DP0776) <br><br> O P I N I O N |

Appeal from orders of the Superior Court of Orange County, Daphne Grace Sykes, Judge.  Affirmed.

Brent Riggs, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

\*         \*         \*

Armando D. (Father) appeals from a dispositional order declaring his three young daughters dependents of the juvenile court and removing them from his custody. He claims the court's jurisdictional findings under Welfare and Institutions Code[1] section 300 were not supported by substantial evidence; the subsequent removal order under section 361 was also in error; and his attorneys provided ineffective assistance by failing to present exculpatory evidence on his behalf.

We affirm. As discussed below, the record contains substantial evidence Father repeatedly struck his five-year-old daughter in the face, causing swelling, bleeding, bruising, and redness. His insistence that these markings are birthmarks is belied by multiple accounts from the children, responding police officers, and the assigned social workers. Although the striking involved a single incident, the extent of the child's injuries and her tender age are sufficient to establish Father's conduct amounted to serious physical abuse. Father's denial of any culpability lends further support to the at-risk findings for all three children. Accordingly, we conclude there is sufficient evidence to support the juvenile court's jurisdictional findings and dispositional order. The dispositional order is further insulated from any challenge by Father's stipulation to its parameters.

We also reject Father's argument that his counsel provided ineffective assistance by not investigating or submitting allegedly exculpatory evidence—namely, photographs and medical reports that document the child's birthmarks. There were logical tactical reasons for counsel to forego pressing this defense, and there is no

---

[1]     All further statutory references are to this code.

2

reasonable probability Father would have obtained a more favorable result had his counsel submitted this evidence.

## FACTS

1. *Events Leading to the Petition*

M.I. (Mother) and Father are married and have three children: E.D. (age 8), A.D. (age 6), and G.D. (age 2). As of spring 2022, Mother worked full time as a housekeeper; Father, who suffers from various physical ailments due to past injuries and complications from COVID-19, was unemployed and stayed home to care for the children.

The family came to the attention of the Orange County Social Services Agency (the Agency) on June 2, 2022, which was E.D. and A.D.'s last day of school. E.D. went to school that day; A.D. (age 5 at the time) did not. When school staff asked E.D. why A.D. was absent, E.D. said Father hit A.D. in the face the night before and made her bleed, and A.D. stayed home to avoid being teased or questioned.

Social workers made an unannounced visit to the family home later that day. They observed A.D. had a one-half inch circular scab or red mark above her upper left lip, bruises on her left eyelid and the lower part of her eye, and red marks spanning across her forehead from temple to temple.

Father allowed the social workers to interview A.D. and E.D. When they asked A.D. what happened to her face, she answered Father hit her with a belt, and it left bruises and made her bleed from her mouth. One of the social workers called the police.

The police did not arrive for three hours; during the interim, Father had contact with A.D. While waiting for the police, the social workers met again with A.D. and E.D. to ask questions unrelated to the incident. This time, A.D. claimed Father did not hit her, she was not worried about anything, and she felt safe, but she made limited eye contact and seemed guarded to the social worker.

3

E.D. likewise denied any domestic violence or physical abuse. When asked if she had any questions, E.D. volunteered that the reason A.D. did not go to school was because Father made her bleed. E.D. elaborated that she saw Father hit A.D. about 10 times with an open hand while they were in the kitchen, and she (E.D.) got scared and ran to the other room.

When the police arrived, one officer stayed with Father, and the other officer and a social worker interviewed A.D. At first A.D. said she did not know what happened to her face; she said Father did not hit her and claimed it was E.D. When the social worker asked about her earlier statement that Father hit her with a belt, A.D responded, "My dad get mad" and told her "you have to say no." A.D. also denied having a fever. The officers observed a scab on A.D.'s lip, the bruising and swelling near her eye, and red marks on her forehead, and noted she did not have a fever and felt normal to the touch.

Father remained outside with one police officer while the other officer and the social worker spoke with E.D. inside. E.D. again confirmed she saw Father hit A.D. about 10 times with an open hand, raising her hand to show how Father had struck A.D. E.D. added she saw A.D. bleeding from her mouth, and A.D. "'cried a lot.'" E.D. said she told Mother what happened, and Mother said "'you have to be brave.'" When asked about discipline, E.D. recounted Father hit her (E.D.) in the past with an open hand, but she could not recall the last time it happened.

The police officer and the social worker then spoke with Mother, who claimed A.D. did not go to school that day because she was sick with a fever. Mother added that the day before, she had noticed A.D.'s face was red and thought this was because A.D. fell asleep on the car seatbelt while the family ran errands. Mother said Father did not use physical discipline on the children, and when she had asked Father about A.D.'s face, he said he did not know what happened. Mother was noted as being guarded and not forthcoming during the interview.

4

The police officer and social worker then spoke with Father, who insisted A.D. stayed home from school because she had a fever. Father added A.D. has birthmarks on her face that redden when she gets upset. He said he did not know how she got the bruising but speculated it could have been from the children fighting or from the car seatbelt. Father said he did not know why A.D. or E.D. would say he hit A.D., and he noted that E.D. has autism.[2] He did not seem concerned with A.D.'s bruises or the marks on her face.

Police arrested Father for child cruelty. He was later charged with a misdemeanor.

At the social worker's recommendation, Mother took A.D. to the hospital the next day, where A.D. said Father "hit[ ] her to teach her." The child was observed to have a red mark on her face.

About a week later, E.D. and A.D. both participated in forensic Child Abuse Services Team (CAST) interviews. E.D. recounted Father told her not to tell the truth and again reported Father hit A.D. with an open hand, and pointed at her temples, forehead, and eye. E.D. explained Father did this because A.D. had hit Father.

During A.D.'s CAST interview, she first claimed that nobody hit her, and she did not know what happened, and then that E.D. had been the one who hit her. Later in the interview, A.D. commented Father hit her hand once, but it no longer hurt.

That same day, a social worker consulted with a CAST child abuse specialist, who opined the markings on the left side of A.D.'s face had an outline of an open hand, and the bruising and marks could not have been caused by a car seatbelt.

The social worker also spoke with Mother; she reported Father had been released from jail and was staying in the family home, and the children did not seem to be

---

[2]     E.D. has high functioning autism; according to her therapist, she understands more than other children as a result.

5

afraid of him. Mother added that both E.D. and A.D. told her that Father hit A.D., leaving marks and bruises, and when Mother questioned Father about the marks on A.D. after he was released from jail, he claimed a stroller fell on her.

Social workers interviewed E.D. and A.D. again on June 21, 2022, and they observed A.D. had light red marks above her right eye and on her right temple. During the interview, A.D. again reported Father hit her, gesturing with an open hand and slapping herself three times on her temples and lip ("like this").

2. *The Petition and Subsequent Proceedings*

The next day, a protective custody warrant issued removing the three children from Father's custody and leaving them with Mother. The Agency then filed a jurisdictional petition as to the three children based on Father's physical abuse of A.D. and his then unknown whereabouts. Among other things, the petition alleged A.D. fell under subdivision (a) of section 300 (serious physical harm), all three children fell under subdivisions (b)(1) (failure to protect), and E.D. and G.D. fell under subdivision (j) (abuse of sibling).

Father and Mother both appeared at the detention hearing. Mother and the children were represented by appointed counsel, and Father was represented by privately retained counsel, Ashley Kagasoff. The juvenile court found a prima facie case existed under section 300, detained the children from Father only, maintained them in Mother's custody with protective orders, and ordered family reunification services and monitored visitation for Father.

A social worker visited Mother and the children on July 7, 2022. She observed A.D. had no visible marks or bruises, aside from some blotchy red markings on her temples and forehead. During the visit, A.D. pointed to her forehead and frowned, saying Father "'hit me here three times.'" When asked why Father hit her, A.D. ignored the question and said, "The lady told me to say that he hit me." When asked why the

6

lady said this, A.D. responded she did not know and shrugged her shoulders. A.D. then added it was the first time Father had struck her and he needed to say he was sorry.

The social worker also talked to E.D. When asked why Father lived somewhere else, the child answered, "'Because he hit [A.D.] and now he has to live away.'" E.D. added that Father told her not to talk to the police.

When the social worker interviewed Mother, Mother claimed that Father never hit the children, that on the day of the incident A.D. had been hot and red from playing and being outside, and that her birthmarks are more prominent when her body temperature increases. Mother insisted neither parent physically disciplined the children.

The social worker also interviewed Father's sister, who said Father would never harm the children, and claimed the initial social worker must have exaggerated A.D.'s marks. The sister showed the social worker photographs of A.D. on her cellphone that she said were taken the day after the incident, explaining A.D. has a birthmark on her forehead and temples that becomes more prominent when she runs or plays; she expressed concern that Father was being blamed for something he did not do.

The children continued to have monitored visitation with Father; these visits generally went well. During one such visit in July, A.D. and E.D. both told Father he should apologize for hitting A.D.; Father did so.

In August 2022, lawyer Christopher Engels was associated in as Father's retained cocounsel. Soon thereafter, at a meeting held in anticipation of the jurisdiction hearing, Engels advised the Agency and county counsel that Father would invoke his Fifth Amendment rights and not respond to any questions about the jurisdictional allegations. During this meeting, Father repeatedly refused to sign his case plan or referral paperwork, and he tried several times to deny the allegations against him. The social worker eventually left the meeting because Father seemed not to understand his attorney's instructions not to discuss the allegations.

7

After multiple continuances, the jurisdictional hearing took place in September 2022.  Father did not appear.  The juvenile court asked Father's counsel whether Father would submit on the Agency's reports; counsel confirmed he had discussed the matter with Father and Father desired to submit.  Proceeding in Father's absence, the court found the allegations in the petition to be true by a preponderance of the evidence, sustained the petition as to all three children, and set the matter for a contested dispositional hearing.[3]

When the social worker visited the family in their home later that month, she observed A.D. had a slight redness in her face from running and playing, and the birthmarks on her forehead and temples appeared to grow darker the more she exerted herself.

In October 2022, Father's attorneys declared a conflict; the juvenile court relieved them and appointed new counsel to represent Father.  Father told the social worker he would show his new attorney evidence establishing his innocence, but he provided no details.

A few weeks later, Father (acting in propria persona) filed a declaration avowing that his prior counsel, Ashley Kagasoff, had refused to review documents and medical reports proving his innocence, such as medical reports documenting A.D.'s birthmarks on her forehead, as well as pictures taken one day after the incident showing no facial marks or injuries.

Meanwhile, the children's visits with Father continued to go well.  At a November 2022 home visit, both E.D. and A.D. said they missed Father and wanted more visits with him.

---

[3]     Father filed a notice of appeal from the jurisdictional findings in November 2022.  (Case No. G062006.)  This court dismissed the appeal because it was from an unappealable order, noting that Father may appeal once dispositional orders are entered.

The dispositional hearing went forward in January 2023. That morning, all counsel (including Father's appointed counsel) submitted proposed orders and findings declaring the children dependents of the juvenile court under section 360, finding by clear and convincing evidence that removal from Father was required under section 361, and approving the Agency's case plan (which included general counseling, a child abuser's treatment program, and a parenting class). The court adopted those proposed orders and findings. Father filed a notice of appeal.

## DISCUSSION

1.     *Substantial Evidence Supports the Findings and Order*

Father first contends the Agency failed to credibly establish A.D. suffered serious physical harm or that the children are at substantial risk of serious physical harm. According to Father, there was insufficient evidence that he abused A.D. because the markings on A.D. were birthmarks, not bruises; A.D.'s injuries did not constitute serious physical harm in any event; and there was insufficient evidence of a future risk of physical harm. Thus, he contends, both the jurisdictional findings and the dispositional order must be reversed. We cannot agree.

A juvenile court may assert jurisdiction over a child when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Jurisdiction also lies when the child has suffered, or there is a substantial risk the child will suffer, serious physical harm as a result of the parent's failure or inability to adequately protect the child. (§ 300, subd. (b)(1)(A).) Finally, the court may also assert jurisdiction when "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300, subd. (j).) Jurisdictional findings are made by a preponderance of the evidence. (§ 355, subd. (a).)

9

After jurisdiction has been established, a juvenile court may order a child physically removed from his or her parent if the court finds by clear and convincing evidence that the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c)(1).) "The jurisdictional findings are prima facie evidence that the child cannot safely remain in the home. [Citation.] The parent need not be dangerous and the child need not have been actually harmed for removal to be appropriate." (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

We review a juvenile court's jurisdictional findings and dispositional order for substantial evidence and will affirm if substantial evidence, contradicted or uncontradicted, supports those findings. (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "'"In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*Ibid.*)

In this case, there is substantial evidence that Father abused A.D. by slapping her face. The evidence includes A.D.'s and E.D.'s repeated accounts[4] of Father striking A.D., the opinion of the CAST child abuse specialist that the markings on the left side of A.D.'s face had an outline of an open hand, and observations by the police and social workers of a scab on A.D.'s upper lip, bruises and swelling near her eye, and red marks on her forehead. Viewed in the light most favorable to the juvenile court's

---

[4] The sisters' accounts of the abuse varied on certain details. However, both girls repeatedly corroborated the core details of what happened. In any event, we must resolve any evidentiary inconsistencies in favor of the juvenile court's findings.

findings and order, this evidence is sufficient to establish that Father repeatedly struck his then five-year-old daughter's face, causing bruising, swelling, and bleeding.

Father argues the police officers and social workers mistook A.D.'s birthmarks for signs of abuse. But even if the birthmarks on her forehead and temples were mistaken for injuries, that would not explain the scab on A.D.'s lip or the swelling near her eye. Further, Father's birthmark explanation conflicts with other evidence: both sisters reported that Father struck A.D. multiple times in the face, and both girls (who are familiar with A.D.'s normal appearance) reported it was Father's strikes to A.D.'s face that caused her injuries.

Father asserts A.D.'s injuries do not rise to the level of '"serious physical harm"' within the meaning of section 300. We are not persuaded. Although the term "serious physical harm" is not defined by statute, "parents of common intelligence can discern what injuries fall within its reach." (*In re Mariah T*. (2008) 159 Cal.App.4th 428, 438 (*Mariah*).) Bruising, swelling, and bleeding spread across different parts of a five-year-old child's face which were caused by repeated blows from a grown man qualify as "serious physical harm." (See also *In re David H.* (2008) 165 Cal.App.4th 1626, 1645 [bruises, red marks, welts, and broken skin on a seven-year-old boy constituted serious physical harm]; *Mariah,* at p. 438 [three-year-old boy suffered serious physical harm when mother hit him with belt and left deep purple bruises]; *In re Benjamin D*. (1991) 227 Cal.App.3d 1464, 1472 [pinching that caused bruising that lasted over four days established substantial risk of serious physical harm]; see also *In re D.M*. (2015) 242 Cal.App.4th 634, 641 [collecting cases where physical discipline exceeded reasonable limits and constituted abuse].)

Substantial evidence also supports the juvenile court's finding that all three children are at a risk of future abuse. Father attempts to paint the abuse as an "isolated act." However, E.D. reported that Father had physically disciplined her in the past by hitting her with an open hand. And dependency jurisdiction may exist based on a single

episode of endangering conduct, depending on the nature of the conduct, all surrounding circumstances, and the present circumstances, such as "the parent's current understanding of and attitude toward the past conduct that endangered a child." (*In re K.S.* (2016) 244 Cal.App.4th 327, 337.) In this case, Father's attitude supports the juvenile court's finding of a future risk of harm to the children: Father proffered inconsistent explanations about what caused the swelling, bleeding, and bruising on A.D.'s face (e.g., a car seatbelt, a falling stroller, or the children fighting), and rather than take any responsibility for his conduct, he has instead become more adamant in his denials. (See *In re Esmeralda B*. (1992) 11 Cal.App.4th 1036, 1044 ["denial is a factor often relevant to determining whether persons are likely to modify their behavior in the future"].)

E.D. reported Father struck A.D. 10 times because A.D. had struck him. The visceral and violent reaction to misconduct by a five-year-old child could reasonably support an inference that Father lacks the ability to control himself in the face of misbehaving children, and that he could pose a future risk to them without appropriate intervention. In short, as required by the applicable standard of review under which we must review the record in the light most favorable to the lower court's determinations and draw all reasonable inferences from the evidence to support its findings and orders, we conclude substantial evidence supports the juvenile court's finding that the children are at a risk of future abuse.[5]

We also affirm the dispositional order removing the children from Father's custody. To start, Father forfeited any challenge to the dispositional order because his appointed counsel, together with counsel for the other parties, proposed the dispositional

_____

[5] The petition also alleged a count under section 300, subdivision (g) (failure to support), based on Father's unknown whereabouts when the petition was filed. Father argues, and the Agency concedes, that his whereabouts were known by the time of the jurisdiction hearing, and he had not left the children without provision for support. Nevertheless, the jurisdictional findings and the subsequent dispositional order are supported by the core abuse allegations.

12

findings and orders that the juvenile court ultimately adopted. (See *In re Richard K.* (1994) 25 Cal.App.4th 580, 589–590 [parent's submittal on removal recommendation precluded her from challenging removal order on appeal].)[6]

In any event, the evidence of abuse underpinning the jurisdictional findings also supports the dispositional order. While Father correctly points out that removal orders are subject to a higher burden of proof (clear and convincing evidence under section 361), the record before us supports the relevant at-risk findings under both standards. (See *In re William B.* (2008) 163 Cal.App.4th 1220, 1230 ["The fact that the juvenile court had earlier made jurisdictional findings on some of the same evidence using a preponderance of the evidence standard does not impugn the validity of the subsequent dispositional findings"].) For these reasons, we discern no error in the juvenile court's jurisdictional findings or dispositional order.

2. *Ineffective Assistance of Counsel*

Father next contends he received ineffective assistance of counsel because his attorneys did not properly investigate the case. According to Father, if his attorneys had done a minimal investigation, they would have learned he had exculpatory evidence in his possession, including photographs and medical reports documenting A.D.'s birthmarks. Had this evidence been presented, contends Father, the juvenile court likely would have dismissed the allegations against him.

---

[6] Father argues on reply that there is no indication in the record that he was present at the disposition hearing or made aware of the stipulation's contents or consequences. However, there is also no indication in the record Father objected to the stipulation or that the stipulation was unauthorized. The disposition hearing was unreported, so we have only the proposed dispositional findings and orders and the juvenile court's subsequent minute order. On this record, we have no basis to conclude his attorney's proposal of the dispositional findings and orders that the court ultimately adopted was unauthorized.

13

"We address a claim of ineffective assistance of counsel in the dependency context by applying a two-part test. In the first step, we examine whether trial counsel acted in a manner expected of a reasonably competent attorney acting as a diligent advocate. If the answer is no, we move to the second step in which we examine whether, had counsel rendered competent service, the outcome of the proceeding would have been more favorable to the client." (*In re Ana C*. (2012) 204 Cal.App.4th 1317, 1329–1330.) If the record on appeal sheds no light on why counsel acted in the challenged manner, we generally affirm "'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.'" (*In re Emilye A*. (1992) 9 Cal.App.4th 1695, 1716.)

Applying these standards, we conclude Father's claim of deficient representation fails. We do not believe Father's counsel performed below the standard of a reasonably capable and effective lawyer by failing to present photographs and medical reports documenting A.D.'s birthmarks, nor do we believe that presenting such evidence would have resulted in a more favorable outcome for Father. The fact that A.D. bore birthmarks on her face was hardly disputed; a social worker confirmed their existence.

Faced with A.D.'s and E.D.'s accounts of abuse and the observations of both law enforcement and the assigned social workers, a competent attorney easily could have determined Father's best path to obtaining custodial and visitation rights rested in foregoing a confrontational and dubious defense based on A.D.'s birthmarks. The fact that Father has been represented by at least three attorneys in the proceedings below—two retained and one appointed—none of whom pursued the strategy he now advocates for, speaks to the fact that a reasonably competent attorney would not have presented the evidence that Father believes would have resulted in a dismissal.

14

## DISPOSITION

The jurisdictional findings and dispositional order are affirmed.


GOETHALS, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MOTOIKE, J.