Filed 7/25/14  In re Connor S. CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

**In re CONNOR S., a Person Coming Under the Juvenile Court Law.**

| | |
|---|---|
| **MENDOCINO COUNTY HEALTH AND HUMAN SERVICES AGENCY,** | A139589 |
| **Plaintiff and Respondent,** | (Mendocino County Super. Ct. No. SCUK-JVSQ-12-16482-01) |
| v. | |
| **D.S.,** | |
| **Defendant and Appellant.** | |

_____/

D.S. (mother) appeals from the juvenile court's termination of her parental rights as to Connor S. (Connor) following a Welfare and Institutions Code section 366.26 (.26) hearing.[1]  She contends the court erred by: (1) declining to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd.

---

[1]    Unless noted, all further statutory references are to the Welfare and Institutions Code.  Presumed father Teddy S. (father) is not a party to this appeal and is mentioned only where necessary.  We grant respondent Mendocino County Health and Human Services Agency's (the Agency) unopposed request for judicial notice of this court's order summarily dismissing mother's Notice of Intent to File Writ Petition for failure to comply with Rules of Court, rule 8.542(c)(1).  (*D.S. v. Superior Court of Mendocino County* (May 8, 2013, A138264).)

1

(c)(1)(B)(i)); (2) denying her section 388 petition without a hearing; and (3) denying her requests for a bonding study and an "updated psychological evaluation." Mother also challenges the court's jurisdictional dispositional findings, and the court's termination of reunification services.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case has a lengthy history. We provide a brief procedural history and recite only those facts relevant to the issues mother raises on appeal.

*Detention, Jurisdiction, and Disposition*

Connor was born in 2005. He has three significantly older siblings. Mother was arrested three times between 1993 and 1997 for inflicting corporal injury on a spouse or cohabitant (Pen. Code, § 273.5, subd. (a)) and convicted in 1997 for fighting in a public place or challenging another person to fight in a public place (Pen. Code, § 415, subd. (1)). Mother and father had "8 prior referrals, 5 of which were investigated from February 2, 2005 to February 28, 2012[.]" A February 2012 referral "was closed as inconclusive, as [ ] mother was uncooperative and refused to meet with the Agency."

In March 2012, the Agency filed, and later amended, a petition alleging Connor came within section 300, subdivision (b) because mother had a substance abuse problem and mental health issues inhibiting her ability to care for Connor. The operative second amended petition alleged mother: (1) was arrested in January 2012 for driving under the influence (Veh. Code, § 23152, subd. (a)) and tested positive for methamphetamine, opiates, and THC; (2) was arrested in March 2012 after driving with Connor in the car while under the influence of methamphetamine (Health & Saf. Code, § 11550, subd. (a)); (3) "smokes marijuana and drinks beer while driving around with her son;" (4) was raped, "which may have resulted in Post Traumatic Stress Disorder[;]" and (5) "is suffering from long standing and chronic depression and mania. Bipolar disorder runs in her family." The court detained Connor, ordered both parents to submit to drug testing, and authorized services and visitation for them.

2

The jurisdictional hearing was delayed numerous times and conducted over several days in May and June 2012. At the hearing, the Agency offered evidence of a 2011 restraining order requiring mother to stay away from Connor's maternal grandmother (grandmother) and evidence that grandmother had been appointed guardian of one of Connor's brothers in 2012 based on documents averring "[t]here is a lot of domestic violence in the home with the mother and children" and that mother was "not an emotionally stable person and can be volatile at any time." The Agency also offered evidence regarding mother's: (1) January and March 2012 arrests, and her June 2012 arrest for violating a protective order (Pen. Code, § 273.6, subd. (a)); (2) March and April 2012 positive tests for alcohol and THC; and (3) referral history and Agency investigations.

At the conclusion of the jurisdictional hearing, the court adjudged Connor a dependent of the court (§ 300, subd. (b)). It explained the "allegations are very strong that [mother] has a substance abuse problem that inhibits her ability to provide regular care for the child. [¶] And also, based on the history and comments of all the different family members, and even [grandmother's] having to get a restraining order and the guardianship . . . on the other child, that, I think, by a preponderance of the evidence that there's sufficient evidence that [mother] has a mental health issue that would inhibit her ability to provide regular care for her child."

In its dispositional report, the Agency reported mother had not participated in services and had been visiting Connor at grandmother's residence in violation of the restraining order. According to the Agency, Connor's "visits with the mother are not as appropriate as the father's visits, and some visits have not been age appropriate." Mother disparaged the Agency during visits and held "Connor, age 6, like a baby." At the conclusion of the July 2012 dispositional hearing, the court determined by clear and convincing evidence: (1) returning Connor to mother's care would cause substantial danger to Connor's physical health, safety, protection, or physical or emotional well-being; and (2) the "extent of the progress made by the mother . . . has been none." The court ordered family reunification services for both parents and ordered mother to, among

3

other things, participate in a drug and alcohol treatment program and undergo a psychological evaluation.

*Psychological Evaluations and the Agency's Section 388 Petition*

In November 2012, Dr. Jacqueline Singer, Ph.D., evaluated mother and recommended she be eavulated by a psychiatrist. According to Dr. Singer, mother's thinking was "tangential and she showed significant problems with focus. She also had difficulty in managing her emotions[.]" Dr. Singer opined: "It is not likely, given [mother's] inability to remain focused and her tangentiality, that she will be able to benefit from services provided. She needs considerable encouragement due to her dependency, but her own paranoia often results in her inability to perceive others as wanting to help her. She also minimizes her challenges, both psychiatric and substance related, and unless she is willing to participate in [substance abuse treatment] . . . and understands her need for such treatment, it is not likely that she will benefit" from reunification services "in the statutory time frame."

Dr. Albert J. Kastl, Ph.D., reached a similar conclusion after evaluating mother in December 2012. He observed mother was "extremely animated with significant pressure of speech and many tangential responses. She was easily distracted. [¶] . . . Her calculation skills are extremely poor." Dr. Kastl noted mother's "memory skills fall at approximately the 2nd percentile for the general population. These results highlight the extreme difficulty she would have in retaining training material of the type offered in reunification services." Dr. Kastl opined mother was "unlikely that she could benefit from reunification services within the statutory time frame" because of her "cognitive, memory, and emotional issues[.]"

Based on these evaluations, the Agency filed a section 388 petition (Judicial Council form No. JV-180) to bypass reunification services pursuant to section 361.5, subdivision (b)(2), which allows the court to bypass reunification services where there is clear and convincing evidence "the parent . . . is suffering from a mental disability . . . that renders . . . her incapable of utilizing those services."

4

*Section 388 and Six-Month Review Hearing*

In reports prepared for the six-month review hearing, the Agency stated mother tested positive for marijuana in July 2012 and November 2012, tested positive for methamphetamine in March 2013, had been arrested for violating the protective order (Pen. Code, § 273.6, subd. (a)), and had unexcused absences from group therapy sessions. The Agency also described the problematic nature of mother's visits with Connor: mother was late to visits, and was argumentative and spent considerable time on electronic devices. The Agency noted mother had begun treatment for mental health issues in December 2012 and was "now engaged in her service objectives. What is uncertain is if she is benefiting from these services in order to provide a stable home for Connor should he be returned to her care."

At the conclusion of the six-month review hearing in March 2013, the court terminated reunification services and set a .26 hearing. The court determined mother had partially complied with her case plan but was not making "significant progress toward alleviating or mitigating the causes necessitating placement. The extent of the progress has been minimal." It also found by clear and convincing evidence the Agency offered reasonable reunification services to mother. Finally, the court granted the Agency's section 388 petition, concluding the evidence that mother suffered from a mental disability justified terminating her reunification services. The court also concluded there was a substantial likelihood reunification would not occur based on mother's failure to "make substantive progress toward her treatment plan."

The court advised mother of her right to seek appellate review of the order by filing a petition for writ review. Mother filed a Notice of Intent to File Writ Petition, which this court summarily dismissed after mother failed to file a timely writ petition. (See Cal. Rules of Court, rule 8.542(c)(1).) (*D.S. v. Superior Court of Mendocino County*, *supra*, A138264.)

*Mother's Section 388 Petition*

On the day of the .26 hearing, Catherine Manno — mother's durable power of attorney — filed a section 388 petition and supporting declaration requesting the court set

5

aside certain orders due to changed circumstances.[2]  According to Manno, the Agency's failure to comply with the Indian Child Welfare Act of 1978 (25 U.S.C., § 1901 et seq.) and mother and grandmother's reconciliation constituted changed circumstances.  The court denied the section 388 petition without a hearing.  It determined Manno did not have standing to file the petition, and the petition was untimely and not properly served.  The court also concluded the facts in the petition and supporting declaration were not new or relevant to the court's decision to terminate services and that modifying the court's previous orders was not in Connor's best interest.

At that point, Manno told the court there was "never any bond assessment ordered in this matter, and there was never an independent evaluation ordered[.]"  Then mother asked to have someone else "other than [the Agency]" evaluate her.  Mother's counsel requested a continuance to allow mother to "obtain another psychological" evaluation.  The court denied the requests, explaining: "We continued this hearing once already before, and we already have two psychological reports that address the issues."

*The .26 Hearing*

In its .26 hearing report, the Agency stated there was clear and convincing evidence Connor "will be adopted if his parents' rights are terminated" and recommended terminating parental rights.  The Agency reported "Connor is well adjusted in his present placement. . . . [H]e has been even more content and less anxious since the visits were reduced to once a month.  Connor has told [the social worker] that he loves his mother and would like to live with her again.  On March 20, 2013, he told a foster sibling he would like his mother to live in his foster home.  With the exception of one incident, Connor has been very happy in his present placement.  He has said many times that he

---

[2]     It appears the section 388 petition was lodged in the trial court, but it is not part of the appellate record through no fault of mother.  At mother's suggestion, we assume for the sake of argument her section 388 petition sought "the reinstatement of family reunification services or the return of Connor to her care[.]"

6

likes living there."[3]  Connor's counsel supported the Agency's recommendation to terminate parental rights.

The California Department of Social Services (CDSS) determined Connor was "likely to be adopted and recommend[ed] parental rights be terminated and a plan of adoption be ordered."  Although it concluded the interaction between Connor and mother "may have some incidental benefit," it determined "such benefit does not outweigh the benefit [he] will gain through the permanence of adoption.  CDSS finds that termination of parental rights would not be detrimental" to Connor.

At the hearing, mother testified she was employed, had reconciled with grandmother, was living at grandmother's house, and was seeking treatment for Post Traumatic Stress Disorder.  Grandmother testified mother had resumed residing with her in July 2013 and their relationship had improved.  Counsel for mother argued Connor was bonded to mother, loves her, and terminating parental rights "would cause a huge detrimental effect" to him.  Mother's counsel urged the court to consider guardianship with grandmother.

At the conclusion of the August 2013 .26 hearing, the Court determined it was in Connor's best interest to terminate parental rights.  It acknowledged there "would be probably some benefit from parental contact" but concluded the benefit was "far outweighed by the benefit of permanence in his case given the history of the tumult in [Connor's] family and his mother's care."  The court considered and rejected guardianship as an alternative because it was "fraught with problems" in part because of "the dynamic between the mother and grandmother."

---

[3]  According to the Agency, Connor initially "wanted his mother and father to be able to move into the foster home with him because he liked it there.  [Later], he stated that he wanted to move in with his mother or father.  After dwelling in the current home for several months, Connor stated that even though his parents couldn't move into the home with him, he wanted to stay in his current placement because he liked the family and the school there."

DISCUSSION

I.

*The Court Did Not Abuse Its Discretion by Concluding the Beneficial
Parent-Child Relationship Exception Did Not Apply*

At great length, mother contends the court erred by declining to apply the beneficial parent-child relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)). Under section 366.26, subdivision (c)(1), the court must terminate parental rights if it finds the child is likely to be adopted unless the parent establishes, by a preponderance of the evidence, one of the statutory exceptions applies. To establish the applicability of the beneficial relationship exception, mother must demonstrate she "maintained regular visitation and contact with [Connor] and [Connor] would benefit from continuing the relationship" with her. (§ 366.26, subd. (c)(1)(B)(i).) The issue here is whether mother can establish Connor would benefit from continuing the parental relationship. She cannot.

To determine whether the beneficial relationship exception applies, the juvenile court "balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) The beneficial relationship exception is "difficult to make in the situation, such as the one here, where" mother has not "advanced beyond supervised visitation." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51 (*Casey D.*).) The beneficial relationship exception "may be the most unsuccessfully litigated issue in the history of law. . . . [I]t is almost always a loser." (*In re Eileen A.* (2000) 84 Cal.App.4th 1248, 1255, fn. 5 (*Eileen A.*), disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413-414.)

Here, the court determined the beneficial relationship exception did not apply because any benefit in maintaining the parental relationship was "far outweighed by the

8

benefit of permanence in [Connor's] case given the history of the tumult in his family and his mother's care." This determination was not an abuse of discretion. (*In re K.P.* (2012) 203 Cal.App.4th 614, 621-622 (*K.P.*).)[4] Mother's argument that visits were "positive" does not persuade us the court abused its discretion by declining to apply the beneficial relationship exception. Mother ignores the overwhelming evidence demonstrating many visits were not positive. The visits remained supervised because of mother's behavioral issues: she was late, argumentative, and complained throughout the visits. During some visits, mother allowed Connor to play computer games and spent considerable time looking at her phone. For many visits, Connor was quiet, sullen, and did not initiate conversation. He answered his mother with "yes" or "no" and rarely smiled. During some visits, Connor did not want to hug his mother or sit on her lap.

We are not persuaded by mother's claim that the court erred by declining to apply the beneficial relationship exception because Connor "needed to maintain his relationship" with her. There is no dispute Connor loved mother and at one point told the social worker he wanted to "return to his mother or grandmother." On the other hand, Connor's emotional well being and behavior improved after the court reduced his visits with mother and there was ample evidence Connor was comfortable in his foster home and bonded with his foster family. Connor also considered his foster family his "'forever' family." Viewing the evidence in a light most favorable to the judgment, we conclude the court did not abuse its discretion by concluding the beneficial relationship exception did not apply. (*In re G.B.* (July 9, 2014, A140107, A140624) ___ Cal.Rptr.3d ___ [2014 WL 3350689] [trial court did not err by declining to apply beneficial

---

[4] "For years California courts have diverged in their view about the applicable standard of review for an appellate challenge to a juvenile court ruling rejecting a claim that an adoption exception applies. Most courts have applied the substantial evidence standard of review to this determination" and at least one court "concluded that it is properly reviewed for an abuse of discretion. [Citation.]" (*K.P., supra,* 203 Cal.App.4th at p. 621, citing cases.) We adopt the "composite standard of review" to evaluate the applicability of the beneficial relationship exception articulated in *K.P.* (*Id.* at pp. 621-622.) We focus on the court's conclusion with respect to the second prong, which we review for abuse of discretion. (*Id.* at p. 622.)

relationship exception where visits were supervised and children "were in a secure placement and were bonded with their prospective caregivers"].)

This case is not, as mother suggests, like *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) In *S.B.,* the record included a bonding study by a doctor describing the bond between the father and the child as fairly strong and opining there was potential for harm if the child lost her parental bond with the father. (*Id.* at pp. 295-296.) Here and in contrast to *S.B.*, the record is devoid of any evidence from a mental health provider, social worker, or bonding expert that terminating parental rights would cause Connor emotional or psychological detriment. Mother concedes there is a plausible argument "Connor would not benefit from ongoing contact with [her]," likely because the Agency and CDSS concluded terminating mother's parental rights would not be detrimental to Connor and because Connor's attorney supported the termination of parental rights.

To establish the beneficial relationship exception, mother was required to show "more than that the relationship [with Connor] is 'beneficial.'" (*Casey D., supra,* 70 Cal.App.4th at p. 52, fn. 4.) She needed to demonstrate her relationship with Connor promoted his well-being "'to such a degree that it outweighs the well-being [he] would gain in a permanent home with new, adoptive parents.' [Citation.]" (*Ibid.,* quoting *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1342 (*Lorenzo C.*).) Mother failed to do so. We conclude the court did not abuse its discretion by declining to apply the beneficial relationship exception. (*In re C.F.* (2011) 193 Cal.App.4th 549, 555-556 [pleasant visits between the mother and the child, and the child's sadness at the end of some visits, did not establish beneficial relationship exception].)[5]

II.

*The Court Did Not Abuse Its Discretion by Summarily Denying*
*Mother's Section 388 Petition*

Next, mother contends the court erred by denying her section 388 petition without a hearing. According to mother, the court "was required to hold an evidentiary hearing"

---

[5]     Mother's claim that the Agency failed to adequately document certain visits does not alter our conclusion.

on the petition because it "presented new evidence and requested changes . . . that might have served [Connor's] best interest." We disagree.

A parent of a dependent child may, "upon grounds of change of circumstance or new evidence," petition the juvenile court to change, modify, or set aside any court order. (§ 388, subd. (a).) The petition must allege why the requested change is "in the best interest of the dependent child." (§ 388, subd. (b).) "If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . the court shall order that a hearing be held[.]" (§ 388, subd. (d).) The court may deny a section 388 petition without a hearing when the petition fails to make a "prima facie showing of a change of circumstances and that the proposed change of order is in the best interest of the child." (*In re D.R.* (2007) 155 Cal.App.4th 480, 487 (*D.R*).) We review the court's summary denial of a section 388 petition for abuse of discretion. (*D.R., supra,* at p. 487.)

The court did not abuse its discretion by summarily denying mother's section 388 petition (irrespective of the petition's procedural deficiencies) because it failed to make a prima facie showing changed circumstances. Manno's declaration — the only evidence offered in support of the petition — recited information already before the court, e.g., that mother had been a victim of spousal abuse, that mother had been receiving mental health treatment, and that mother and grandmother had reconciled. We reject mother's claim — unsupported by authority — that her establishment of a power of attorney "standing alone, was prima facie evidence of a changed circumstance."

Nor did mother's petition make a prima facie showing that reinstating reunification services and/or returning Connor to her care would be in Connor's best interest. (*In re C.J.W.* (2007) 157 Cal.App.4th 1075, 1081; *In re G.B.*, *supra*, ___ Cal.Rptr.3d ___ [2014 WL 3350689].) In light of the evidence discussed above, mother could not overcome the "rebuttable presumption that, in the absence of continuing reunification services, stability in an existing placement is in the best interest of the child, particularly when such placement is leading to adoption by the long-term caretakers." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 465 (*Angel B*.) We conclude the court did not abuse its discretion by summarily denying mother's section 388 petition and the summary

11

denial did not violate her due process rights. (*In re E.S.* (2011) 196 Cal.App.4th 1329, 1340 [no due process violation where decision on section 388 petition was based on information provided in the petition, documentary evidence, and argument]; *In re Jackson W.* (2010) 184 Cal.App.4th 247, 260.)

III.

*The Court Did Not Abuse its Discretion by Denying Mother's Request for a Bonding Study and an Updated Psychological Evaluation*

Mother claims the court abused its discretion by denying her request for a bonding study and her request for an "updated psychological evaluation." Assuming for the sake of argument Manno's statement that there was "never any bond assessment ordered in this matter" was a request for a bonding study, the court did not abuse its discretion by denying the request. Here, it was "unlikely that a bonding study would have been useful to the juvenile court" because there was sufficient evidence upon which to evaluate the bond between mother and Connor. (*Lorenzo C., supra,* 54 Cal.App.4th at p. 1341.) The purpose of ordering a bonding study is to have an expert determine and then testify to the attachment, if any, between the parent and child. Even without a bonding study, there was ample evidence before the court regarding the bond between mother and Connor because the Agency's reports described mother's visits with Connor and mother and because grandmother testified about mother's relationship with Connor.

The court's denial of mother's request for a bonding study was also proper because the request was untimely. Mother made the request on the day of the .26 hearing, *five months* after the court terminated reunification services. Granting the request would have delayed the .26 hearing because the Agency would need time to evaluate the study and prepare a response before the .26 hearing. (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1197, fn. omitted ["[b]onding studies after the termination of reunification services would frequently require delays in permanency planning. . . . The Legislature did not contemplate such last-minute efforts to put off permanent placement. . . ."].)

12

We also reject mother's argument regarding the court's denial of her request for an "updated psychological evaluation." Mother does not explain how an updated evaluation would have altered the court's conclusions at the .26 hearing, nor does mother cite any authority requiring a juvenile court to order an updated psychological evaluation under the circumstances present here.

IV.
*Mother Has Waived Her Claims Regarding the Court's Jurisdictional and Dispositional Orders, and the Order Terminating Reunification Services*

Mother challenges the court's jurisdictional and dispositional orders, and the order terminating reunification services. We conclude mother has waived her admittedly "belated challenges" to these orders because she did not appeal from the dispositional order, nor petition for writ review after the court terminated reunification services and set a .26 hearing. (*Sara M. v. Superior Court* (2005) 36 Cal.4th 998, 1018.)

Mother waived her right to challenge the jurisdictional and dispositional orders by failing to timely appeal from the July 2012 dispositional order. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1150-1152 (*Merenda P.*).) She has also waived her right to challenge the March 2013 order terminating reunification services by failing to file a petition for writ review. (§ 366.26(*l*)(1)(A).) The so-called "waiver rule" is justified on numerous grounds, including: (1) "the predominant interests of the child and the state in finality and reasonable expedition;" (2) the legislative intent to "expedite dependency cases and subordinate, to the extent consistent with fundamental fairness, the parent's right of appeal to the interests of the child and the state;" and (3) the "Legislature's intent, evident in section 366.26, subdivision (*l*), to restrict appeals challenging orders setting a [section 366.26] hearing." (*Merenda P., supra,* 56 Cal.App.4th at pp. 1156-1157, fn. omitted.)

Because of these important policy considerations, courts enforce the waiver rule unless "due process forbids it." (*In re Janee J.* (1999) 74 Cal.App.4th 198, 208 (*Janee J.*).) Due process is implicated only if mother shows: (1) there was a defect in the proceedings "that fundamentally undermined the statutory scheme so that [she was] kept

13

from availing . . . herself . . . of the protections afforded by the scheme as a whole;" and (2) the defect was not merely an error that "might have been held reversible had [it] been properly and timely reviewed." (*Id.* at pp. 208-209.) She cannot.

Mother contends her counsel was ineffective at the jurisdictional and dispositional hearings, and at the contested six-month review hearing where the court terminated reunification services. According to mother, counsel's ineffectiveness was defect in the statutory scheme that kept her from availing herself of the protections afforded by the statutory scheme as a whole. We have reviewed the record and conclude this claim fails because mother cannot demonstrate "'counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms.'" (*In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1711, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 688.)[6] Ordinarily, "the proper way to raise an ineffective assistance claim is by writ of habeas corpus, not appeal." (*Eileen A., supra,* 84 Cal.App.4th at p. 1253.) Mother cannot avoid application of the waiver rule for the additional reason that she cannot show the alleged defect goes beyond an error that "might have been held reversible had [it] been properly and timely reviewed." (*Janee J., supra,* 74 Cal.App.4th at p. 209.) Mother's arguments to the contrary are unpersuasive and the cases she relies on are distinguishable.

We conclude the waiver rule bars mother's claims regarding the jurisdictional and dispositional orders and the order terminating reunification services. This case exemplifies the "late-stage 'sabotage of the process'" the waiver rule is designed to prevent. (*In re Jesse W.* (2001) 93 Cal.App.4th 349, 355, quoting *Janee J., supra*, 74 Cal.App.4th at p. 207.) A reversal based on alleged errors occurring at jurisdictional and

---

[6]    The court's failure to personally advise mother of her right to appeal from the dispositional order does not alter our conclusion. The court could not personally advise mother of her right to appeal because she left the hearing before it ended. We cannot assume the decision not to appeal from the dispositional order was the result of counsel's "negligence, when it could well have been based upon some practical or tactical decision governed by client guidance[,]" particularly where mother submitted on disposition. (*In re Arturo A.* (1992) 8 Cal.App.4th 229, 243.)

14

dispositional hearings over two years before the order terminating parental rights would require the court to effectively begin the dependency proceedings "anew, thereby adding at minimum another 14 months to the duration of the proceeding[.]" (*Meranda P., supra,* 56 Cal.App.4th at p. 1152.)

DISPOSITION

The order terminating mother's parental rights is affirmed.

_____<br>Jones, P.J.

We concur:

_____<br>Simons, J.

_____<br>Needham, J.