Filed 7/15/15  In re F.R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re F.R. et al., Persons Coming Under the Juvenile Court Law. | C076107 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY, | (Super. Ct. No. J06154) |
| Plaintiff and Respondent, | |
| v. | |
| F.R., Sr., | |
| Defendant and Appellant. | |

F.R., Sr., the father of minors F.R., N.R., and I.R., appeals from the juvenile court's orders terminating his parental rights.  (Welf. & Inst. Code, §§ 366.26, 395.)[1]  He contends the juvenile court violated his right to due process by terminating parental rights without a finding of unfitness by clear and convincing evidence.  Father also contends the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

1

juvenile court erred in finding the minors adoptable, trial counsel was ineffective, and cumulative error warrants reversing the juvenile court's orders. We shall affirm.

## BACKGROUND

In November 2012 the San Joaquin County Human Services Agency (Agency) filed a dependency petition (§ 300) on behalf of 10-year-old F.R., eight-year-old N.R., and six-year-old I.R. after their mother, S.C., gave birth to their half sibling, A.Q., who tested positive for amphetamine. Mother tested positive for marijuana and amphetamine and admitted using amphetamine the day before giving birth.

Mother and the minors were living in the home of the maternal grandmother, J.R. A home inspection found plenty of food in the home and no hazards. Asked by the social worker whether she would be willing to file for guardianship of the minors, J.R. said yes, but she was limited in what she could do because she had hepatitis C, water retention and swelling, high blood pressure, and arthritis.

In November 2012 the minors were detained to the maternal grandmother's home in the care of the maternal great-aunt, and mother was ordered out of the home. Later that month, an "Absent Parent Locator" was submitted for father and notice was sent to him at the identified address.

The juvenile court sustained the petition with respect to mother in December 2012.

The February 2013 disposition report recommended denying services for father pursuant to section 361.5, subdivision (b)(12), as he had a prior conviction for a violent felony, robbery, and was only an alleged father at the time. Father's criminal history included a juvenile conviction for robbery in 1991 and adult convictions for petty theft in 1995, burglary in 1995, second degree burglary in 2008, petty theft with a prior theft conviction in 2008, and another burglary conviction in 2008.

Mother said she had a good relationship with father, living with him in Long Beach until they separated in 2007. She described him as "a good provider and a good dad to the kids." After their separation, mother and the minors moved to the Stockton

2

area to be closer to mother's family. Mother said the minors visited their father during their summer breaks. Father had yet to make contact with the Agency.

The minors were in good physical health and had no mental problems except for F.R., who took Adderall for attention deficit hyperactivity disorder (ADHD) and was in counseling after witnessing acts of violence in his former apartment, including a shooting where a man was killed. The minors remained in the care of the maternal great-aunt, who resided in the maternal grandmother's home. The home had not been approved: the entire family, including the maternal grandmother's 16-year-old daughter, lived in a one-bedroom apartment, and the maternal grandmother had a criminal history that required exemption.

Father did not appear at his jurisdiction hearing in January 2013, so the matter was continued to February 2013. Father did not show up at the continued hearing, and the juvenile court sustained the petition. The juvenile court also found father was the minors' presumed father and denied him reunification services pursuant to section 361.5, subdivision (b)(12).

At a May 2013 hearing the juvenile court noted that father had called a social worker and provided a new address. The Agency asked the juvenile court to find notice was proper and default father, which the court did.

The July 2013 six-month report recommended terminating the services of mother and A.Q.'s father. F.R.'s mental health assessment concluded he did not need additional mental health services as he was taking his ADHD medication, was seeing a counselor at school, and had completed an anger management class at school. N.R. and I.R. did not qualify for mental health services. The minors were closely bonded to each other and remained together with their half sibling A.Q. in the maternal grandmother's home. The minors were deemed adoptable in a June 2013 adoption assessment.

In August 2013 father filed a motion to set aside the jurisdictional and dispositional findings for lack of notice. Also in August 2013 the juvenile court

3

terminated mother's services and ultimately set a December 2013 date for the hearing on father's motion. The juvenile court denied father's motion and set a section 366.26 hearing at the December 2013 hearing. Father filed a writ petition regarding the denial of his motion, which a panel of this court denied pursuant to *Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501, 1513-1514. (*F.R. v. Superior Court* (Feb. 6, 2014, C075432) [petn. den. by order].)

The February 2014 section 366.26 report recommended terminating parental rights with a permanent plan of adoption. The maternal great-aunt was approved for potential adoptive placement, but after the great-aunt disclosed that she was in a relationship and was moving to Southern California in February 2014, the maternal grandmother was then referred for an adoptive home study. The grandmother completed the initial paperwork for the home study in January 2014.

By this time, the maternal grandmother resided in a four-bedroom home in Stockton with the maternal great-aunt, the minors, and the grandmother's 17-year-old daughter. She was 49 years old, single, and a stay-at-home mother/caretaker. The maternal grandmother had three prior criminal convictions, for which she received an exemption in February 2013. She also had a child welfare history of eight referrals, two of which became voluntary family maintenance cases in Southern California.

The report found the maternal grandmother had cared for the minors for a significant period of time prior to the dependency case, and they were closely bonded to her. The Agency assessed the maternal grandmother as very capable of meeting the minors' needs. In addition, she understood the legal and financial rights and responsibilities of adoption, and was very committed to the permanent plan of adoption.

The minors were doing well in the maternal grandmother's home. Their needs were being met by the maternal grandmother, who loved them as if they were her own children. The minors expressed excitement about being adopted by the maternal grandmother. They had been "in a place of uncertainty when the parents failed

4

reunification," but they gained a sense of belonging and security once the adoption process started.

F.R., now in the sixth grade, continued to struggle academically. He received a mental health referral in November 2013 due to a high number of school suspensions and the anger he displayed toward others at school. A January 2014 assessment concluded that his mental condition did not cause problems serious enough to make him eligible for specialty mental health services. A "SMART referral" for F.R. was pending at the time of the section 366.26 report. The other minors had no physical or mental health problems.

Father was not present at the March 2014 section 366.26 hearing, where his counsel entered general objections. The juvenile court found by clear and convincing evidence the minors were likely to be adopted, terminating parental rights was in the minors' best interests, termination was not detrimental to the minors, and none of the exceptions to termination of parental rights applied. Accordingly, the juvenile court terminated parental rights with a permanent plan of adoption.

## DISCUSSION

## I

Father contends the juvenile court violated his right to due process by terminating his parental rights without a finding of unfitness or detriment to the minors by clear and convincing evidence. We disagree.

" 'Parents have a fundamental interest in the care, companionship, and custody of their children. (*Santosky v. Kramer* (1982) 455 U.S. 745, 758 [71 L.Ed.2d 599, 102 S.Ct. 1388] . . . .) *Santosky* establishes minimal due process requirements in the context of state dependency proceedings. "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations *by at least clear and convincing evidence*." [Citation.] "After the State has established parental unfitness at that initial proceeding, the court may assume at the

5

*dispositional* stage that the interests of the child and the natural parents do diverge." [Citation.] "But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." [Citation.]

" 'California's dependency system comports with *Santosky's* requirements because, by the time parental rights are terminated at a section 366.26 hearing, the juvenile court *must* have made prior findings that the parent was unfit. [Citation.] "The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child." [Citation.] The linchpin to the constitutionality of the section 366.26 hearing is that prior determinations ensure "*the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must align itself.*" [Citation.]' [Citations.]" (*In re Frank R.* (2011) 192 Cal.App.4th 532, 537.)

California's dependency scheme does not use the term "parental unfitness," requiring instead that the juvenile court find that awarding custody of a dependent child to a parent would be detrimental to the child. (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 224, fn. 3 (*Dakota H.*).) This finding can be made in various ways, e.g., denial of services, abandonment, conviction of a felony showing parental unfitness, or continued removal from parental custody coupled with termination of reunification services.[2]

_____

[2] Section 366.26 provides in part: ". . . A finding under subdivision (b) or paragraph (1) of subdivision (e) of Section 361.5 that reunification services shall not be offered, under subdivision (e) of Section 366.21 that the whereabouts of a parent have been unknown for six months or that the parent has failed to visit or contact the child for six months, or that the parent has been convicted of a felony indicating parental unfitness, or, under Section 366.21 or 366.22, that the court has continued to remove the child from the custody of the parent or guardian and has terminated reunification services, shall

6

Where any of these findings have been made during the reunification period, no further finding of detriment is required at the section 366.26 hearing. To comport with due process, it is only necessary that such a finding is made at some point in the dependency prior to termination of parental rights. (*In re Gladys L.* (2006) 141 Cal.App.4th 845, 848-849.)

The juvenile court denied father reunification services pursuant to section 361.5, subdivision (b)(12) on the basis of his prior juvenile conviction in 1991 for robbery, a violent felony. (Pen. Code, § 667.5, subd. (c)(9).) Father argues "[t]his 20-year-old juvenile court 'true finding' of a robbery should not be used to bootstrap a denial of services to a father that lived with his children for eight years subsequently; was described as a good father and provider; exercised summer visitation; and had no child protective history."

Father's argument is too late. He did not appear at the disposition hearing where the juvenile court denied services to him and did not appeal that ruling. The rulings at that hearing are therefore final, and father has forfeited any claims of error relating to those rulings, including ineffective assistance of counsel. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2; *In re Daniel K.* (1998) 61 Cal.App.4th 661, 667; *In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1159-1160.) We accordingly conclude that the juvenile court's ruling that services would be denied based on father's prior violent felony conviction constitutes a sufficient finding of detriment to satisfy due process.

**II**

Father claims there is insufficient evidence to support the juvenile court's finding that the minors were adoptable. We disagree.

---

constitute a sufficient basis for termination of parental rights. . . ." (§ 366.26, subd. (c)(1).)

A court must find, by clear and convincing evidence, that a child is likely to be adopted before terminating parental rights and selecting adoption as the permanent plan for the child. (§ 366.26, subd. (c)(1); *In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) We review this finding for substantial evidence. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154.) "[W]e presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order. [Citations.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

"The issue of adoptability . . . focuses on the *minor*, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor. [Citations.]" (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) It is not necessary that the minor already be in a potential adoptive home, or even that there be a prospective adoptive parent. (*Ibid.*; see also § 366.26, subd. (c)(1) ["The fact that the child is not yet placed in a preadoptive home . . . shall not constitute a basis for the court to conclude that it is not likely the child will be adopted"].) And the prospect that the minor may have some continuing behavioral problems does not foreclose a finding of adoptability. (See *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 224-225.) However, "[t]here must be convincing evidence of the likelihood that adoption will take place within a reasonable time. [Citation.]" (*In re Brian P.* (2002) 99 Cal.App.4th 616, 624 (*Brian P.*).)

Father argues "the Agency claimed that the children were adoptable because the maternal grandmother was willing to adopt the children." According to him, "[t]hese children might possibly be specifically adoptable, because the maternal grandmother wishes to adopt them. But the concerns about this very grandmother's health and functioning formed part of the basis for the juvenile court's jurisdictional findings, and the children were not even placed in her custody and control up to the termination of rights hearing." Father notes the maternal great-aunt was originally approved for

adoption, and it was only when she told the Agency she was moving to Southern California to be with her boyfriend that the Agency began assessing the maternal grandmother as a prospective adoptive parent. In light of the maternal grandmother's "significant child welfare and criminal history," father contends she may face an "insurmountable legal impediment" to adoption. He concludes that the juvenile court "should have deferred an adoptability finding until it was clear that the maternal grandmother is capable of providing care on her own and that she will be approved for adoption."

While the issue of adoptability usually focuses on the minor, "in some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child." (*Sarah M., supra*, 22 Cal.App.4th at p. 1650.) "Where the social worker opines that the minor is likely to be adopted based solely on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent [citations]. In such cases, the existence of one of these legal impediments to adoption is relevant because the legal impediment would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted. [Citation.]" (*Ibid.*)

The term "specifically adoptable," therefore, denotes a child who but for the existence of a prospective adoptive parent would not be adoptable. The suitability of the prospective adoptive parent is not an issue when the child is generally adoptable; it may be placed in issue when the child is specifically adoptable.

Father's argument is based on a mistaken premise, that the Agency found the minors adoptable based solely on the maternal grandmother's willingness to adopt them. The minors were found adoptable in a June 2013 adoption assessment, as was first noted in the July 2013 six-month report. The six-month report also recommended changing the

9

permanent plan to adoption and terminating parental rights. This report does not indicate that adoption had been discussed with either the maternal grandmother or the maternal great-aunt. While the February 2014 section 366.26 report focused on the maternal grandmother's willingness to adopt the minors, the Agency considered the minors adoptable well before determining that any specific person was willing to adopt them.

In this case, neither the social worker nor the Agency opined that the minors were likely to be adopted solely on the basis of the existence of a prospective adoptive parent. Nor is this a case in which the parties agreed that the children were adoptable only because there was someone willing to adopt them. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1061.) In fact, at the section 366.26 hearing, the issue of specific adoptability was never raised or discussed. Father did not contest the issue of adoptability, let alone argue that the children were only specifically adoptable. He did not challenge the maternal grandmother's suitability to adopt the minors or argue that there might be any legal impediment to the adoption. He therefore forfeited the right to claim on appeal that the minors were only specifically adoptable. (*Dakota H.*, *supra*, (2005) 132 Cal.App.4th at pp. 221-222.)

Although a party need not object below to a factual determination made by the court in order to challenge the sufficiency of the evidence supporting that particular determination on appeal (*Brian P.*, *supra*, 99 Cal.App.4th at p. 623), the issue of specific adoptability was never raised and the court did not find the minors to be specifically adoptable. Here, the social worker rendered an unqualified opinion that the minors were adoptable. Consistent with this opinion, the court made an unqualified finding that the minors were likely to be adopted. We construe the court's finding as to adoptability to mean adoptability in the general sense, a finding that is supported by substantial evidence, namely the June 2013 adoption assessment and the maternal grandmother's willingness to adopt the minors. We accordingly reject father's attempt, under the guise of a sufficiency of the evidence argument, to inject into this appeal the issue of specific

10

adoptability.  All issues pertaining to the suitability of the prospective adoptive parent to adopt are reserved for the subsequent adoption proceeding.  (*In re T.S.* (2003) 113 Cal.App.4th 1323, 1326.)

**III**

Father next contends that trial counsel was ineffective for failing to challenge the lack of a detriment finding, failing to request custody pursuant to section 361.2, and failing to file a section 388 petition seeking immediate custody.[3]  The claim is without merit.

A parent claiming ineffective assistance of counsel has the burden of showing that counsel failed to act in a manner to be expected of reasonably competent counsel and "counsel's representation fell below an objective standard of reasonableness." (*Strickland v. Washington* (1984) 466 U.S. 668, 688; [80 L.Ed.2d 674, 693]; see *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1711.)  The parent must also show prejudice, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694 [80 L.Ed.2d at p. 698].)

As we have already found, the juvenile court made the required finding of detriment at the disposition hearing when it denied father's reunification services based on his prior violent felony conviction.  Any contrary contention at the section 366.26

---

[3]  The caption of the section in father's opening brief raising this claim reads, in pertinent part, that he was denied effective assistance of counsel where " no challenge was made to the erroneous denial of reunification services."  The text of this section contends only that counsel was deficient for failing to challenge termination of parental rights without a finding of detriment and for not filing a section 361.2 request for custody finding or not filing a section 388 petition requesting custody.  We conclude the reference to the alleged ineffectiveness at the disposition hearing is either inadvertent or forfeited by failing to support the contention in the body of the brief.

hearing would have been rejected. Trial counsel need not raise futile objections to forestall ineffective assistance claims. (*People v. Memro* (1995) 11 Cal.4th 786, 834.)

Father's other contentions of ineffective assistance are likewise without merit.

"[W]hen a nonoffending noncustodial parent requests custody under section 361.2, subdivision (a), he or she is requesting sole legal and physical custody of a child. However, the court may not immediately grant that parent sole legal and physical custody. The court must first determine whether it would be detrimental to the child to temporarily place the child in that parent's physical custody. If there is no showing of detriment, the court must order the Agency to temporarily place the child with the nonoffending noncustodial parent. The court then decides whether there is a need for ongoing supervision. If there is no such need, the court terminates jurisdiction and grants that parent sole legal and physical custody. If there is a need for ongoing supervision, the court is to continue its jurisdiction." (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1134-1135.)

The record is almost devoid of any evidence that father could obtain placement of the minors under this provision. Father has an extensive criminal record and was never assessed as a possible placement by the Agency. The only evidence supporting his fitness as a parent was mother's bare statement that he was a good parent and provider when she last lived with him, and the fact that the minors had spent summers with him. During the dependency, the minors were living with the maternal grandmother, with whom they had closely bonded. Granting a section 361.2 motion would have removed them from the home they had known and placed them in Southern California with a man about whom the juvenile court knew very little. Based on this record, a section 361.2 motion would have been futile, and counsel's failure to file one did not constitute ineffective assistance.

The party filing a section 388 petition has the burden of establishing that modifying the juvenile court's order would be in the minor's best interests.

(*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) In assessing the best interests of the child, the juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability. (*Ibid*.) A section 388 petition seeking placement of the minors with father would fail on this record, as there is no evidence that removing them from the maternal grandmother, who cared well for them and with whom they were bonded, and placing them with father was in their best interests. Once again, based on the record before us, counsel was not ineffective for failing to file what would have been a futile motion.

## IV

Father's final contention is that cumulative error warrants reversing the juvenile court's orders. Finding no error, we necessarily reject this contention.

## DISPOSITION

The juvenile court's orders are affirmed.


                                                    RAYE         , P. J.


We concur:


        BLEASE       , J.


        MAURO       , J.