Filed 2/28/22  In re P.M. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re P.M., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> P.M., <br><br> Defendant and Appellant. | E077386 <br><br> (Super.Ct.No. SWJ1800400) <br><br> OPINION |

APPEAL from the Superior Court of Riverside County.  Denise Trager Dvorak and Mark E. Petersen, Judges.\* Affirmed.

William P. Melcher, under appointment by the Court of Appeal, for Defendant and Appellant.

---

\* San Bernardino County Superior Court Judge Denise Trager Dvorak presided over the jurisdictional hearing from which minor appeals.  Riverside County Superior Court Judge Mark E. Petersen presided over the dispositional hearing.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, A. Natasha Cortina and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Appellant (minor), P.M., appeals from a juvenile court determination that he committed robbery in violation of Penal Code section 211. Minor contends that at the jurisdictional hearing (effectively a bench trial), the juvenile court erroneously admitted the unavailable victim's hearsay statements to a police officer. We conclude that the hearsay statements were properly admitted as spontaneous statements made under the stress of excitement pursuant to Evidence Code section 1240,[1] and that the admission of the hearsay statements did not violate minor's right to confrontation. The judgment is affirmed.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In this case, minor was tried on a juvenile wardship petition alleging that he committed second degree robbery (Pen. Code, § 211) and street terrorism (Pen. Code, § 186.22, subd. (a), count 2) when he robbed a fruit vendor at gunpoint and took $700. When it came time for trial, the prosecution was unable to locate the victim. The victim

---

[1] All undesignated statutory references are to the Evidence Code.

thus did not testify, but the investigating officer testified to a statement that the victim made.

A. *The Hearsay.*

On April 4, 2021, at approximately 4:40 p.m., Montclair police officers responded to an armed robbery call at the intersection of Bensen Avenue and Palo Verde Street in Montclair. The officers arrived three to five minutes after the call.

A police officer spoke with the victim, who was pacing back and forth and "looked upset." The victim was perspiring, his pupils were dilated, he "was trying to keep his composure," and was trying to "get some air" or "catch his breath." The officer spoke to the victim for less than five minutes. During the brief conversation, the victim stated that two men had robbed him of $700 at gunpoint, putting the gun to his chest and kicking him. The victim pointed toward a church on the southwest corner of the intersection to indicate where the robbers went.

B. *The Other Evidence.*

Several witnesses near the scene testified. Mrs. Carbajal, who was with her husband and daughter, saw the victim, who was a fruit vendor, with two males standing on either side of him. The males looked like they were tugging on the victim and went in his apron pockets. The victim fell to the ground and was in "like a crunch ball." The suspects ran toward a small path leading to the back of a nearby church. Carbajal and her family were able to see that one of the suspects had a gun. They followed the suspects to the other side of the church, where Carbajal saw them get into a grey or silver Toyota

3

Camry and speed away. She took a picture and recording of the license plate before returning to the scene.

Mrs. Peete and her husband also witnessed the incident. She saw two males grab the victim's arms. Peete saw the suspects run toward a silver Toyota Camry that was parked in the church parking lot. She returned to the crime scene after the suspects got away.

Mr. Ramos was with his wife when they noticed two males standing behind the victim. He saw one of the males stand in front of the victim, while the other stood behind him. As the victim reached into his pocket, both suspects "rushed" him and a scuffle ensued. The taller of the two reached into the victim's pockets and tried to grab something. The two males then ran away with their fists clenched, as if they had something in their hands. Ramos saw the two suspects run toward the back of the church parking lot, get into a silver or grey car, and speed off.

Surveillance cameras captured four videos of the robbery and showed the suspects fleeing the scene. A pastor at the nearby church contacted the police to provide them with videos from the church surveillance cameras.

A detective took still shots of the videos and zoomed in on the suspects depicted in the pictures. This led him to focus on minor and his coparticipant. The detective pulled a booking photograph for minor from a 2018 arrest from Moreno Valley and compared it to the still photographs from the video. The detective determined the person in both was "very, very likely" the same individual.

4

The detective obtained a search warrant for minor's home. On April 15, 2021, as a SWAT team moved toward minor's home, the minor's coparticipant exited the residence. Officers saw that he had a gun on him and a foot pursuit ensued. Officers arrested him and the detective recovered the gun in a neighbor's backyard. The gun was a P-80 ghost gun, with no serial number, make, or model number. It was similar to a Glock nine-millimeter handgun.

During the execution of the search warrant, the detective spoke with minor's mother. She identified her son as the individual in the picture from the video surveillance footage. She specifically noted the medallion on her son's necklace and said she had bought the necklace for him.

### C. *Objections and Rulings.*

Minor's counsel first objected to the victim's hearsay statement when the prosecutor made a pretrial motion to admit the unavailable victim's statement to officers as a spontaneous statement pursuant to section 1240. Counsel argued that the statement was inadmissible hearsay and its admission would violate minor's right to confrontation. Counsel continued to object during trial, and the court heard argument on the matter at the conclusion of the evidence.

In overruling minor's objection, the juvenile court distinguished the statement admitted at trial from a victim interview when the officer returned 15 minutes later, "which was clearly for the purpose of preparing a report in participation of litigation." The court observed that during the initial conversation with the victim, the officer just "basically asked what happened, so that he knew what to do and how to act and where to

go from there." The court relied on the officer's testimony that the victim was perspiring, his eyes were dilated, his tone seemed concerned and worried, he tried to get air as he tried to describe what happened, he provided only basic information, and did not identify anyone. The court rejected defense counsel's argument that it was determinative that, at the time of the statement, the victim was no longer at risk because the suspects had fled the scene.

In finding the statement admissible under the spontaneous statement exception to the rule against hearsay, the juvenile court observed that the victim's statement was very brief and in response to a simple question about what happened. The court found that the victim was still under the stress or excitement of the event, as it had happened only three to five minutes prior to him making his statement and he seemed nervous, he was pacing, perspiring, and "clearly appeared to be under the influence of the incident at that time." The court found no violation of the confrontation clause.

The court dismissed count two of the petition but found true the Penal Code section 211 robbery allegation. At minor's dispositional hearing, the court declared minor to be a continued ward of the court and committed him to the Pathways to Success program, with a maximum confinement time of three years. The court also ordered minor to follow terms of juvenile probation and to pay a restitution fine.

III.

DISCUSSION

Minor makes a twofold argument that the judgment must be reversed because the juvenile court erred in admitting the victim's hearsay statements. First, he contends that

6

the victim's statements were the product of deliberation and reflection, so they were improperly admitted under section 1240, the spontaneous statement exception to the hearsay rule. Second, he contends that the victim's statements were testimonial, so their introduction violated his Sixth Amendment right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). We disagree with both contentions and find the evidence was properly admitted.

A. *Admission of Hearsay Under the Spontaneous Statement Exception (Evid. Code § 1240).*

Out-of-court statements offered for the truth of the matter asserted are hearsay. (§ 1200, subd. (a).) Hearsay is inadmissible unless it falls under one of the exceptions to the hearsay rule. (*Id.*, subd. (b).) Under section 1240, " '[e]vidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception.' " (*People v. Brown* (2003) 31 Cal.4th 518, 540; see § 1240, subds. (a) & (b).)

In determining whether a statement is admissible under section 1240, the speaker's mental state is the most crucial element. (*People v. Brown*, *supra*, 31 Cal.4th at p. 541.) " 'The nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, for example—may be important, but solely as an indicator of the mental state of the declarant.' " (*Ibid.*) " 'Neither lapse of time between the event and the declarations nor the fact that the declarations were elicited by

7

questioning deprives the statements of spontaneity if it nevertheless appears that they were made under the stress of excitement and while the reflective powers were still in abeyance.' [Citation.]" (*People v. Poggi* (1988) 45 Cal.3d 306, 319 (*Poggi*), italics omitted.)

Whether a hearsay statement qualifies as a spontaneous statement is generally a question of fact for the trial court, and its determination involves an exercise of the court's discretion. (*People v. Merriman* (2014) 60 Cal.4th 1, 65.) We review the trial court's factual findings under a substantial evidence test and apply the abuse of discretion standard to the court's ultimate ruling. (*People v. Phillips* (2000) 22 Cal.4th 226, 236.)

The California Supreme Court's holding in *Poggi*, *supra*, 45 Cal.3d 306, is instructive. In *Poggi*, the victim was raped and stabbed several times by a stranger. (*Id.* at pp. 315-316.) Police responded to the scene 30 minutes later and found the victim in a "very excited state" and bleeding profusely. (*Ibid.*) Officers interviewed the victim for 15 to 20 minutes about the attack, during which she provided details about the attack and information about the suspect. (*Id.* at pp. 316-320.) Our Supreme Court held that the victim's statements were properly admitted at trial under section 1240. (*Id.* at p. 320.) The Court reasoned: "Here the record supports the finding of spontaneity. First, although [the victim] made the statements at issue about 30 minutes after the attack, it is undisputed that she was still under its influence. Second, it is also undisputed that she remained excited as she made the statements, even though she had become calm enough to speak coherently. Finally, the fact that the statements were delivered in response to questioning does not render them nonspontaneous. [The officer's] questions appear to

8

have been simple and nonsuggestive—in substance, 'What happened?', 'What happened then?', and so on." (*Id.* at pp. 319-320.)

*Poggi*'s reasoning confirms the trial court's discretion to admit the victim's statements about being robbed at gunpoint. Like the victim in *Poggi*, the victim was agitated and upset when he made his statement about being attacked and robbed. When the officer arrived at the scene, he observed the victim to be upset and noticed him pacing back and forth. The officer could tell that the victim had difficulty maintaining his composure and seemed "concerned." Additionally, the victim perspired although it was not that warm outside, and the officer noticed that his pupils were dilated. During the conversation, which lasted less than five minutes, the victim paced back and forth the entire time and had a "concerned" and "worrisome" tone. He was still so affected by what had happened to him that he had to take breaks between sentences to try to catch his breath.

Also as in *Poggi,* we have no reason to conclude that the officer's questions were suggestive. He arrived three to five minutes after a dispatch call about the crime in a situation where officers obviously would want to quickly obtain information to possibly apprehend a suspect. He testified that when he initially spoke to the victim, it was to try to get information regarding the call and suspect.

The officer acknowledged that he conducted a second, more in-depth interview with the victim 15 minutes later. Unlike the initial conversation, that interview would more naturally be structured with questions where officers intended to obtain information for potential prosecution, rather than simply to obtain essential details about a crime that

9

had just been committed with an armed suspect in flight. By the later interview, the victim had stopped pacing. Like the juvenile court, we find it significant that the hearsay admitted was only from the first interview, and we find it reasonable to infer that when the officer initially briefly spoke with the victim, the questioning was not suggestive. Instead, like *Poggi*, the substance of the questioning was merely along the lines of "What happened?" to gather preliminary information to aid officers in dealing with the ongoing emergency and to help them assess issues of public and officer safety.

Given the evidence that the victim was still under stress of excitement from the crime, and the content and context of the statements, we find it reasonable to conclude that his statements admitted in this case were spontaneous and unreflecting. The victim's statements were made only a few minutes after the robbery and appear to have been the product of brief questioning to determine what happened. They were not even the product of 15 to 20 minutes of questioning as in *Poggi*, so it appears fair to conclude that the victim's statements were even less deliberative than the statements from the *Poggi* victim. (See *People v. Farmer* (1989) 47 Cal.3d 888, 904, overruled on another point in *People v. Waidla* (2000) 22 Cal.4th 690, 724, fn. 6 ["an answer to a simple inquiry has been held to be spontaneous," and "detailed questioning, in contrast, is likely to deprive the response of the requisite spontaneity"].) As the trial court put it, "all [the officer] got was, basically, two sentences . . . that two males robbed him at gunpoint, kicked him, took $700, and he pointed towards the church." Accordingly, we conclude that the victim's statement was sufficiently spontaneous that the juvenile court did not abuse its discretion in admitting it pursuant to section 1240.

10

The evidence in this case indicated that officers arrived three to five minutes after receiving their dispatch call but did not reflect how much time elapsed between the crime and the dispatch call. From this, minor argued in his opening brief that the victim made his statements after time for deliberation and reflection: "[a]s this is the conclusive factor in determining admissibility, the victim's statements fail to qualify under the 'excited utterance' hearsay exception." However, in his reply brief, minor correctly acknowledges that a short lapse of time between an event and a statement is not required to deem the statement "spontaneous" and that the "crucial element" is the speaker's mental state. Thus, he argues that because the record does not indicate exactly how long after the incident the police were dispatched, the passage of time was a "factor weighing against a finding of spontaneity." While the passage of time is part of the context to be evaluated by the trial court, we disagree that the gap in the timeline here was significant.

While the record does not reflect the exact amount of time that elapsed between the robbery and the dispatch, there is evidence that it was not long. Mrs. Peete, a witness to the robbery who called 911 and then left the scene to follow the suspects in a car, estimated that approximately 20 minutes passed between the incident and when she returned to the scene, at which time officers were already there. Even if it took the full 20 minutes for the officers to initially arrive, that would not be too long to render the statements inadmissible, with the victim just robbed at gunpoint and still showing the stress of excitement from that crime. Courts have repeatedly held that the lapse of time between the event and the declarations will not deprive the statements of spontaneity if "it nevertheless appears that they were made under the stress of excitement and while the

11

reflective powers were still in abeyance." (*People v. Washington* (1969) 71 Cal.2d 1170, 1176.) Also, as the People point out, much longer periods of time have been found not to preclude application of the spontaneous statement hearsay exception. (See *People v. Brown*, *supra*, 31 Cal.4th at p. 541 [two and one-half hours]; *People v. Raley* (1992) 2 Cal.4th 870, 893-894 [18 hours]; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1713 [one to two days]"]; see also *Poggi*, *supra*, 45 Cal.3d at pp. 319-320 [30 minutes].) As well, it would be quite reasonable to conclude that the officers—arriving three to five minutes after a dispatch triggered by 911 calls—actually arrived well before the 20-minute mark where Peete saw them. Indeed in arguing this matter at the close of trial, minor's counsel reviewed the evidence and argued that based on "reasonable inference[s]" officers "were dispatched and arrived on the scene at around 4:43 p.m., which would be about three minutes after the alleged incident."

Based on the facts, which we are required to consider in a light most favorable to the judgment of the trial court, we conclude that the juvenile court did not abuse its discretion when it overruled minor's hearsay objection and admitted the victim's statement pursuant to section 1240 as a spontaneous declaration.

B. *Confrontation Clause.*

Having determined the victim's statements were admissible under state law, we now turn to minor's claim that their introduction violated his Sixth Amendment right of confrontation under *Crawford*.

The Sixth Amendment guarantees the right to confront adverse witnesses. In particular, the Sixth Amendment bars "admission of testimonial statements of a witness

12

who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at pp. 53-54.) We independently review whether a hearsay statement was testimonial. (*People v. Nelson* (2010) 190 Cal.App.4th 1453, 1466.)

In *Davis v. Washington* (2006) 547 U.S. 813, 822 (*Davis*), the United States Supreme Court clarified what is meant by testimonial statements. It explained: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (Fn. omitted.) Nontestimonial statements do not implicate the confrontation clause. (*Id.* at p. 821.) An objective evaluation of whether an " 'ongoing emergency' at the time of an encounter between an individual and the police is among the most important circumstances informing the 'primary purpose' of an interrogation." (*Michigan v. Bryant* (2011) 562 U.S. 344, 359-361 (*Bryant*).)

The mere fact that statements were admitted as spontaneous pursuant to section 1240 may be sufficient to render them nontestimonial for purposes of the Confrontation Clause. In *People v. Corella* (2004) 122 Cal.App.4th 461, 469, the court observed: "it is difficult to identify any circumstances under which a section 1240 spontaneous statement would be 'testimonial.' The rationale of the spontaneous statement exception to the hearsay rule is that the utterance must be made without reflection or deliberation due to

13

the stress of excitement. [Citation.] . . . [S]tatements made without reflection or deliberation are not made in contemplation of their 'testimonial' use in a future trial." (Fn. omitted.) We concur with this rationale, and it applies here.

In any event, reviewing the evidence without considering the section 1240 admission of the statements, we also find that they do not implicate the confrontation right. In *People v. Blacksher* (2011) 52 Cal.4th 769 (*Blacksher*), our Supreme Court, relying upon *Bryant*, identified six factors to consider in determining whether statements made during police questioning were for the " 'primary purpose of creating an out-of-court substitute for trial testimony' that implicates the confrontation clause." (*Id.* at p. 813.) They are: (1) an objective evaluation of the circumstances of the encounter and the statements and actions of the individuals involved in the encounter; (2) whether the statements were made during an ongoing emergency or under circumstances that reasonably appeared to present an emergency, or were obtained for purposes other than for use by the prosecution at trial; (3) whether any actual or perceived emergency presented an ongoing threat to first responders or the public; (4) the declarant's medical condition; (5) whether the focus of the interrogation had shifted from addressing an ongoing emergency to obtaining evidence for trial; and (6) the informality of the statement and the circumstances under which it was obtained. (*Id.* at pp. 813-815.)

Here, applying the foregoing principles, we have no trouble concluding that the primary purpose of the officer's initial conversation with the victim was to address an ongoing emergency, not to create an out-of-court substitute for trial testimony by the prosecution. The victim was clearly still suffering emotionally and physically from

14

having been robbed at gunpoint shortly before the officers' arrival. Additionally, the armed assailants were still at large. Therefore, the primary purpose of reasonable parties in the officer's and the victim's positions would have been to deal with an ongoing emergency—namely, to ensure that the victim was not injured and to locate the suspects in order to protect the public from any further attacks as well as to ensure officer safety. (See *Blacksher*, *supra*, 52 Cal.4th at p. 814 ["The medical condition of the declarant is a relevant consideration, as it bears on both the injured declarant's purpose in speaking and the potential scope of the emergency."]; see also *People v. Chism* (2014) 58 Cal.4th 1266, 1289 [It was objectively reasonable for the responding officer to believe the at-large suspects, one of whom was presumably still armed with a gun, posed an immediate threat to the public and responding officers; therefore, the witness's statements concerning his observations and descriptions of the suspects were made for the primary purpose of meeting an ongoing emergency and not to produce evidence for use at a later trial.].)

Another important circumstance was the informality of the questioning as evidenced by its brevity. The questioning elicited only a short statement from the victim. There is no evidence that the officer asked extensive or detailed questions. The questioning occurred in an exposed, public area where there were multiple witnesses in the general vicinity. The officer described the scene as "a lot of moving parts going on." Furthermore, the victim paced back and forth during the entire conversation and had to catch his breath between sentences. The informal, slightly chaotic nature of this conversation suggests that reasonable parties would not have intended thereby to create an out-of-court substitute for trial testimony. (*Blacksher*, *supra*, 52 Cal.4th at p. 815

15

[inquiries conducted in a "disorganized way and in turbulent circumstances" are more likely to be nontestimonial than a jailhouse interview].)

It is also important that the officer did not conduct one lengthy and continuous interview with the victim. Instead, he spoke to him for a few minutes before coming back to him 15 minutes later. When he conducted this second interview, the victim had stopped pacing and was calmer. In other words, there was nothing formal, solemn, or structured about the first encounter between the officer and the victim. As our Supreme Court has emphasized: "the proper focus is not on the mere reasonable chance that an out-of-court statement might later be used in a criminal trial. Instead, we are concerned with statements, made with some formality, which, *viewed objectively*, are for the *primary purpose* of establishing or proving facts for possible use in a criminal trial." (*People v. Cage* (2007) 40 Cal.4th 965, 984, fn. 14.)

In sum, we conclude the admission of the victim's statement to the officer did not violate minor's Sixth Amendment right to confrontation.

## IV.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


FIELDS
                                                                    J.


We concur:


RAMIREZ
                        P. J.


MENETREZ
            J.